1   SCOTT P. COOPER, SBN 96905
        scooper@proskauer.com
2   KEITH BUTLER, SBN 215670
        kbutler@proskauer.com
3   PROSKAUER ROSE LLP
    2049 Century Park East, 32nd Floor
4   Los Angeles, California 90067-3206
    Telephone:  (310) 557-2900
5   Facsimile:   (310) 557-2193

6   Attorneys for Defendant
    MBIA, INC.

7

E-filing

ORIGINAL
FILED
SEP 2 2 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                       SAN FRANCISCO DIVISION

MEJ

11   CITY OF OAKLAND,                          Case No.  CV 08 4425

12                  Plaintiff,

13          v.                                 NOTICE OF REMOVAL OF
                                               CIVIL ACTION FROM THE
14   AMBAC FINANCIAL GROUP INC.;               SUPERIOR COURT OF THE
     MBIA, INC.; XL CAPITAL                    STATE OF CALIFORNIA FOR
15   ASSURANCE INC.; FINANCIAL                 THE COUNTY OF SAN
     GUARANTY INSURANCE COMPANY;               FRANCISCO; DECLARATION
16   CIFG ASSURANCE NORTH AMERICA,             OF SCOTT COOPER
     INC.; JASON KISSANE; NEIL PACK;           IN SUPPORT THEREOF
17   and Does 1 – 50,
                                               (S.F. Superior Court,
18                  Defendants.                Case No. CGC-08-479241)

19                                             [No Hearing Required]

20

21

22

23

24

25

26

27

28

1  TO THE CLERK OF THE ABOVE-ENTITLED COURT:

2      PLEASE TAKE NOTICE that defendant MBIA, Inc. ("MBIA"), pursuant to

3  28 U.S.C. §§ 1332, 1441, and 1446,  gives notice that the above-captioned matter is

4  hereby removed to the United States District Court for the Northern District of

5  California from the Superior Court of California, County of San Francisco, where it

6  originally was filed as Case No. CGC-08-479241 on August 28, 2008.

7  **I.       THIS NOTICE OF REMOVAL IS TIMELY AND PROPERLY FILED**

8      1.     Plaintiff filed the complaint in this matter in the Superior Court of

9  California in and for the County of San Francisco on or about August 28, 2008.

10  (Declaration of Scott P. Cooper ("Cooper Decl.") at ¶ 2.)

11      2.     The date upon which defendant MBIA was served with a copy of the

12  Summons and Complaint was on or around September 12, 2008.  (Cooper Decl. at ¶

13  2.)  A copy of the Summons and Complaint is attached as Exhibit A to the

14  accompanying Cooper Declaration.

15      3.     Pursuant to 28 U.S.C. § 1446(a), Exhibit A constitutes the only process,

16  pleadings, and orders served upon MBIA in this case.

17      4.     Pursuant to 28 U.S.C. § 1446(b), MBIA is filing this Notice of

18  Removal within thirty (30) days of service on it of the Summons and Complaint.

19  Moreover, MBIA is filing this Notice of Removal within thirty days of service of

20  the Summons and Complaint on any other party in this action.  *See Murphy Bros.,*

21  *Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354, 119 S. Ct. 1322, 1328, 143

22  L.Ed. 2d 448 (1999) (holding that time for removal does not begin to run prior to

23  service of process); *Luchetti v. Hershey Co.*, No. 08-1629, 2008 WL 2331965, at *3

24  (N.D. Cal. June 4, 2008) (finding formal service of process "a prerequisite for

25  triggering the 30-day removal period").

26      5.     Venue is proper under 28 U.S.C. § 1441(a), which provides for removal

27  to the district court of the United States for the district and division embracing the

28  place where the action is pending.

1    6.    Notice of this removal is being given both to the adverse party and to
2  the state court pursuant to 28 U.S.C. § 1446(d).  A true and correct copy of the
3  Notice to Adverse Party is attached hereto as Exhibit B to the Cooper Declaration.
4  A true and correct copy of the Notice to State Court is attached hereto as Exhibit C
5  to the Cooper Declaration.

6    7.    Additionally, Plaintiff's counsel in this matter filed nearly identical
7  complaints on July 23, 2008 on behalf of the City of Los Angeles in the Superior
8  Court of California in and for the County of Los Angeles, entitled City of Los
9  Angeles v. Ambac Financial Group Inc. *et al.*, under Docket No. BC394943, and on
10  behalf of the City of Stockton in the Superior Court of California in and for the
11  County of San Francisco, entitled City of Stockton v. Ambac Financial Group Inc. et
12  al., as Case No. CGC-08-477848.  On August 22, 2008, the Los Angeles action was
13  removed to federal district court for the Central District of California, and the
14  Stockton action was removed to federal district court for the Northern District of
15  California.

16  **II.    INTRADISTRICT ASSIGNMENT**

17
18    8.    Because Plaintiff alleges that its "claims arise directly from business
     conducted in the City and County of San Francsico" (Complaint at ¶ 24), and
19
     because Plaintiff initially commenced the Action in the Superior Court of the State
20
     of California for the County of San Francisco, pursuant to 28 U.S.C. § 84(a) and
21
     Civil Local Rule 3-5(b), the Action once removed is properly assigned to the San
22
23   Francisco Division of the United States District Court for the Northern District of
     California.
24

25  **III.    BASIS OF REMOVAL**

26    9.    The Court has original jurisdiction over this civil action under 28
27  U.S.C. § 1332 because there is complete diversity of citizenship between the
28  properly-joined parties.

7583/53559-017
Current/1199155
NOTICE OF REMOVAL

1       10.    Plaintiff City of Oakland ("Plaintiff") is a California public entity.

2  (Complaint at ¶ 25)

3       11.    Defendant Ambac Financial Group Inc. is a Delaware corporation with

4  its principal place of business in New York, New York.  (Complaint at ¶ 26)

5       12.    Defendant MBIA Inc. is a Connecticut corporation with its principal

6  place of business in Armonk, New York.  (Complaint at ¶ 27)

7       13.    Defendant XL Capital Assurance Inc. is a New York corporation with

8  its principal place of business in New York, New York.  (Complaint at ¶ 28)

9       14.    Defendant Financial Guaranty Insurance Company is a New York

10  corporation with its principal place of business in New York, New York.

11  (Complaint at ¶ 29)

12       15.    Defendant CIFG Assurance North America, Inc. is a New York stock

13  insurance company with its principal place of business in New York.  (Complaint at

14  ¶ 30)

15       16.    Accordingly, none of these defendants (the "Bond Insurers") are

16  citizens or residents of California.

17       17.    Although the Complaint does not attempt to quantify the alleged

18  damages, it is clear from the Complaint that the amount in controversy easily

19  exceeds $75,000 as required by 28 U.S.C. § 1332(b).  For example, the Complaint

20  states that California public entities paid "hundreds of millions of dollars" in

21  premiums for bond insurance that the Complaint alleges was "worthless."

22  (Complaint at ¶ 2)  Plaintiff also seeks punitive and exemplary damages (Complaint

23  at ¶ E), which are included in the calculation of the amount in controversy.  *See Bell*

24  *v. Preferred Life Assur. Soc.*, 320 U.S. 238, 240, 64 S. Ct. 5, 6, 88 L.Ed. 15 (1943).

25  **IV.    DEFENDANTS JASON KISSANE AND NEIL PACK HAVE BEEN**

26         **FRAUDULENTLY JOINED**

27       18.    In addition to the Bond Insurers, Plaintiff has named as defendants two

28  individuals, Jason Kissane and Neil Pack, who are alleged to be California citizens,

7583/53559-017
Current/1199155

1 | for the sole purpose of destroying complete diversity and preventing defendants
2 | from removing this case to federal court.

3 | 19. Aside from their statuses as current and/or former employees of certain
4 | of the defendants, Kissane and Pack have no connection to the alleged activities that
5 | lie at the core of this case, and they are not the subject of any specific allegations of
6 | conduct that would be sufficient to state a claim against either of them. Given the
7 | limited roles of these two individuals in the matters about which Plaintiff complains,
8 | there is no possibility that Plaintiff can state a cause of action against either of them.

9 | 20. Accordingly, Kissane and Pack were fraudulently joined and they
10 | should be disregarded in determining the presence of diversity jurisdiction. It is
11 | well-established law that fraudulently joined resident defendants will not defeat a
12 | defendant's right of removal on diversity grounds. *Wilson v. Republic Iron & Steel*
13 | *Co.*, 257 U.S. 92, 97, 42 S. Ct. 35, 37, 66 L.Ed. 144 (1921); *Ritchey v. Upjohn Drug*
14 | *Co.*, 139 F.3d 1313, 1318 (9th Cir. 1998). Joinder is fraudulent if "the plaintiff fails
15 | to state a cause of action against a resident defendant, and the failure is obvious
16 | according to the settled rules of the state." *McCabe v. Gen. Foods Corp.*, 811 F.2d
17 | 1336, 1339 (9th Cir. 1987).

18 | 21. Only the Fourth and Sixth causes of action – negligent
19 | misrepresentation and violation of the Cartwright Act – are brought against Kissane
20 | and Pack, and the Complaint, which mentions Pack and Kissane specifically in only
21 | five paragraphs (Complaint at ¶¶ 24, 31, 32, 184, 185), falls far short of stating
22 | those claims.

23 | 22. With respect to the negligent misrepresentation claim, the essential
24 | elements are: "(1) a false statement of a material fact that the defendant honestly
25 | believes to be true, but made without reasonable grounds for such belief, (2) made
26 | with the intent to induce reliance, (3) reasonable reliance on the statement, and (4)
27 | damages." *Century Sur. Co. v. Crosby Ins., Inc.*, 124 Cal. App. 4th 116, 129, 21 Cal.
28 | Rptr. 3d 115, 125 (2004). A claim of negligent misrepresentation under California

5

1  law "must be pleaded with particularity and by facts that show how, when, where, to

2  whom, and by what means the representations were tendered." *Charnay v. Cobert*,

3  145 Cal. App. 4th 170, 185 n.14, 51 Cal. Rptr. 3d 471, 482 n.14 (2006) (internal

4  quotations omitted); *see also Cadlo v. Owens-Illinois, Inc.*, 125 Cal. App. 4th 513,

5  519, 23 Cal. Rptr. 3d 1, 5 (2004) ("The policy of liberal construction of pleadings is

6  not generally invoked to sustain a misrepresentation pleading defective in any

7  material respect."). The Complaint fails to allege a single statement made by

8  Kissane or Pack, to Plaintiff or anyone else, much less a false statement of a

9  material fact, honestly believed to be true, but made without reasonable grounds for

10 such belief and with the intent to induce reliance. Furthermore, to the extent that

11 Plaintiff bases its claim on alleged omissions in financial statements and other

12 public disclosures made by the Bond Insurers, Kissane and Pack played absolutely

13 no roles in making those statements and owed no independent duty to Plaintiff with

14 respect to those disclosures.

15      23.     The Complaint also plainly fails to state a claim for violation of the

16 Cartwright Act, Cal. Bus. & Prof. Code § 16720 *et seq*. against Pack and Kissane.

17 Settled California law requires that to state a claim for a conspiracy in restraint of

18 trade, a complaint must allege "(1) the formation and operation of the conspiracy,

19 (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from

20 such act or acts." *Chicago Title Ins. Co. v. Great W. Fin. Corp.*, 69 Cal.2d 305, 316,

21 70 Cal. Rptr. 849, 856 (1968). "California requires a 'high degree of particularity'

22 in the pleading of Cartwright Act violations, … and therefore generalized

23 allegations of antitrust violations are usually insufficient." *Freeman v. San Diego*

24 *Ass'n of Realtors*, 77 Cal. App. 4th 171, 196, 91 Cal. Rptr. 2d 534, 553 (2000)

25 (*quoting Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 742, 162 Cal.

26 Rptr. 543, 547 (1980)). Moreover, under the pleading standard established in *Bell*

27 *Atl. Corp. v. Twombly*, __U.S.__, 127 S.Ct. 1955,167 L.Ed.2d 929 (2007), the

28 "[f]actual allegations must be enough to raise a right to relief above the speculative

7583/53559-017
Current/1199155

1  level." *Id.* at 1964-65. A complaint must allege "enough facts to state a claim to
2  relief that is plausible on its face." *Id.* at 1974. *See also In re Late Fee and Over-*
3  *Limit Fee Litigation*, 528 F. Supp. 2d 953, 965 (N.D. Cal. 2007) (applying
4  *Twombly*'s pleading standard in dismissing Cartwright Act claim on grounds that
5  "analysis under California's antitrust law mirrors the analysis under federal law");
6  *Korea Kumho Petrochemical v. Flexsys Am.*, No. C07-01057, 2008 WL 686834 at
7  *8 (N.D. Cal. Mar. 11, 2008) (same, stating that "California state courts follow
8  federal cases in deciding claims under the Cartwright Act").

9       24.    With respect to Kissane and Pack, the Complaint simply alleges, in
10  conclusory fashion, that they "knew and acted in concert with other Defendants to
11  maintain the dual rating system." Such general allegations are not sufficient to state
12  a claim unless "the unlawful acts or civil wrongs are otherwise sufficiently alleged."
13  *Chicago Title Ins.*, 69 Cal.2d at 316, 70 Cal. Rptr. at 856.  The only act that the
14  Complaint alleges with respect to Kissane and Pack is their attendance of two
15  industry conferences, where it is alleged that the topics of "the municipal bond
16  insurance industry" and "how to maintain the bond insurance industry by
17  perpetuating the dual rating system" were discussed.  (Complaint at ¶ 184, 185)
18  This allegation clearly does not sufficiently allege any unlawful acts or civil wrongs.

19       25.    Moreover, Pack and Kissane are not individually liable for any alleged
20  wrongful acts of their employers because they themselves were not personally
21  involved in those acts. See Cal. Civ. Code § 2343. Although the doctrine of
22  *respondeat superior* may make a corporation liable for the acts of its employees, the
23  reverse does not hold true – an employee is not generally individually liable for the
24  wrongful acts of its employer corporation.

25       26.    For the reasons set forth above, there is no reasonable basis to argue
26  that California law could impose individual liability on Kissane or Pack for
27  negligent misrepresentation or violations of the Cartwright Act.  There are no facts
28  pled in the Complaint to support a claim that Kissane or Pack engaged in the alleged

1   unlawful activities, nor could such facts be pled in an amended complaint.  Both

2   Kissane and Pack worked in public finance departments.  They had little to no

3   interaction with their companies' structured finance departments, and they had no

4   responsibility for or involvement in preparation of their companies' financial

5   statements or other public disclosures.  They also had little interaction with the

6   rating agencies, which consisted of occasional communications about analyses of

7   particular municipal bond issues, and they certainly never had any discussions about

8   the ratings agencies' bond rating standards or processes, much less the ability to

9   dictate to the ratings agencies any aspects of them.   Kissane's and Pack's

10  attendance at industry conferences, along with hundreds of individuals representing

11  issuers, insurers, investment bankers, and financial advisers, is not indicative of any

12  wrongdoing.  The fraudulent joinder of Kissane and Pack, who have "no real

13  connection with the controversy," cannot defeat the defendants' right of removal.

14  *Wilson*, 257 U.S. at 97, 42 S. Ct. at 37.

15  **V.   DOE DEFENDANTS DO NOT DEFEAT REMOVAL**

16       27.   The Doe defendants should be disregarded in determining the presence

17  of diversity jurisdiction because the Complaint does not identify who they are,

18  where they live, or their relationship to this case.  *McCabe*, 811 F.2d at 1339.

19  **VI.  CONSENTS TO REMOVAL**

20       28.   All defendants other than the improperly-joined Kissane and Pack have

21  joined in this Notice of Removal, as evidenced by the Consents to Removal attached

22  as Exhibit D to the Cooper Declaration.  *Emrich v. Touche Ross & Co.*, 846 F.2d

23  1190, 1193 n.1 (9th Cir. 1988) ("[U]nder 28 U.S.C. § 1446(a), all defendants in a

24  state action must join in the petition for removal, except for nominal, unknown or

25  fraudulently joined parties.")

26  ///

27  ///

28  ///

7583/53559-017
Current/1199155

1    29.   WHEREFORE, MBIA respectfully requests that the above-captioned

2  action be removed from the Superior Court of California for the County of San

3  Francisco to this Court.

4

5  DATED: September 22, 2008         SCOTT P. COOPER
                               KEITH BUTLER

6                                 PROSKAUER ROSE LLP

7

8                                 By:
                                             Scott P. Cooper

9                               Attorneys for Defendants
                               MBIA, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7583/53559-017
Current/1199155

1

## DECLARATION OF SCOTT P. COOPER

2       I, Scott P. Cooper, declare that the foregoing is true and correct to the best of

3   my knowledge and belief :

4       1.    I am an attorney with the law firm of Proskauer Rose LLP, attorneys of

5   record for MBIA, INC ("MBIA").  I am admitted to practice before this Court, and

6   am one of the attorneys responsible for the defense in this case.  Except as may be

7   expressly noted below, I have personal knowledge of the facts set forth herein.

8       2.    I am informed and believe that the Complaint and Summons were filed

9   in the San Francisco County Superior Court on August 28, 2008.  I am informed and

10   believe that on September 16, 2008, my office received by mail the summons and

11   complaint in this action.  Included with the summons and complaint was a Request

12   For Acknowledgement Of Receipt indicating that the summons and complaint were

13   mailed on September 12, 2008.  Pursuant to California Code of Civil Procedure

14   section 1013(a), the earliest date on which service could have been effective is

15   September 12, 2008.  A true and correct copy of the Complaint that was served on

16   MBIA is attached hereto as Exhibit A.

17       3.    Attached hereto as Exhibit B is a true and correct copy of the Notice to

18   State Court, which will be filed and served following the filing of this Notice of

19   Removal.

20       4.    Attached hereto as Exhibit C is a true and correct copy of the Notice to

21   Adverse Party, which will be filed and served following the filing of this Notice of

22   Removal.

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

7583/53559-017
Current/1199155

1       5.      Attached hereto as Exhibit D are true and correct copies of Consents to

2 Removal from all defendants other than Mr. Pack and Mr. Kissane.

3       I declare under penalty of perjury under the laws of the United States of

4 America that the foregoing is true and correct, and that this declaration was executed

5 this 22nd day of September, 2008, at Los Angeles, California.

6

7                                          _____

8                                          Scott P. Copper

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7583/53559-017
Current/1199155

# EXHIBIT A

# SUMMONS
## (CITACIÓN JUDICIAL)

**SUM-100**

**FOR COURT USE ONLY**
**(SOLO PARA USO DE LA CORTE)**

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**
AMBAC Financial Group Inc.; MBIA Inc.;XL Capital
Assurance Inc.;Financial Guaranty Insurance
Company;CIFG Assurance North America, Inc.;Jason
Kissane;Neil Pack; and Does 1-50

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**
City of Oakland

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.  A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you.  If you cannot pay the filing fee, ask the court clerk for a fee waiver form.  If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen.  Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte.  Es posible que haya un formulario que usted pueda usar para su respuesta.  Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca.  Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas.  Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.
Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| The name and address of the court is: | CASE NUMBER: |
|---|---|
| (El nombre y dirección de la corte es): | (Número del Caso): 08 - 479241 |

Superior Court of California
400 McAllister Street

San Francisco 94102
Civic Center Courthouse

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
Nanci E. Nishimura (152621)                                    (650) 697-0577
Cotchett, Pitre & McCarthy
840 Malcolm Road
Burlingame, CA 94010

| DATE: August 28, 2008 | GORDON PARK-LI, Clerk, by | Wilma G. Bautista | , Deputy |
|---|---|---|---|
| (Fecha) | (Secretario) | | (Adjunto) |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

3. ☐ on behalf of (specify):

   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other (specify):
4. ☐ by personal delivery on (date):

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**


Legal Solutions Plus

Code of Civil Procedure §§ 412.20, 465

CM-010

| | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State bar number, and address):
Nanci E. Nishimura (152621)
Cotchett, Pitre & McCarthy
840 Malcolm Road
Burlingame, CA 94010
TELEPHONE NO: (650) 697-6000   FAX NO: (650) 697-0577
ATTORNEY FOR (Name): City of Oakland

**F I L E D**
Superior Court of California
County of San Francisco

AUG 2 8 2008

GORDON PARK-LI, Clerk
BY: _____
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco 94102
BRANCH NAME: Civic Center Courthouse

CASE NAME: City of Oakland v. Ambac Financial Group
Inc., et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [X] Unlimited (Amount demanded exceeds $25,000) [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | CGC-08-479241 JUDGE: DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[X] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [X] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [X] Large number of separately represented parties   d. [X] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [X] Substantial amount of documentary evidence   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief c. [X] punitive

4. Number of causes of action (specify):

5. This case [ ] is [X] is not a class action suit.

6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: August 28, 2008

Nanci E. Nishimura (152621)
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**
Legal Solutions Plus

Cal. Rules of Court, rules 2.30, 3.220, 3.400-3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

1 | John A. Russo, City Attorney (#129729)
jrusso@oaklandcityattorney.org

*Exempt from filing and motion fees pursuant to Gov't Code § 6103*

2 | Barbara Parker, Chief Asst. City Attorney (#69722)
bparker@oaklandcityattorney.org

3 | Mark Morodomi, Sup. Dep. City Attorney (#120914)
mmorodomi@oaklandcityattorney.org

4 | Kathleen Salem-Boyd, Dep. City Attorney (#166679)
ksalemboyd@oaklandcityattorney.org

5 | CITY OF OAKLAND, CALIFORNIA
One Frank H. Ogawa Plaza, 6th Floor

6 | Oakland, CA 94612

7 | Telephone: (510) 238-3034
Facsimile: (510) 238-6500

F I L E D
Superior Court of California
County of San Francisco

AUG 2 8 2008

GORDON PARK-LI, Clerk
BY: _____
Deputy Clerk

CASE MANAGEMENT CONFERENCE

JAN 3 0 2009 - 9ᵒᵒ AM

DEPARTMENT 212

8 | Joseph W. Cotchett (#36324)
jcotchett@cpmlegal.com

9 | Steven N. Williams (#175489)
swilliams@cpmlegal.com

10 | Nanci E. Nishimura (#152621)
nnishimura@cpmlegal.com

11 | COTCHETT, PITRE & McCARTHY
San Francisco Airport Office Center

12 | 840 Malcolm Road, Suite 200
Burlingame, CA 94010

13 | Telephone: (650) 697-6000
Facsimile: (650) 697-0577

Louise H. Renne (#36508)
lrenne@rshslaw.com
Steven P. Shaw (#242593)
sshaw@rshslaw.com
RENNE SLOAN HOLTZMAN
& SAKAI LLP
350 Sansome St., #300
San Francisco, CA 94104
Telephone: (415) 678-3805
Facsimile: (415) 678-3838

14 | *Attorneys for Plaintiff City of Oakland*

15 |        SUPERIOR COURT OF THE STATE OF CALIFORNIA

16 |        IN AND FOR THE COUNTY OF SAN FRANCISCO
CGC 08 - 4 7 9 2 4 1

17 |

18 | CITY OF OAKLAND

19 |        Plaintiff,

20 |        vs.

21 | AMBAC FINANCIAL GROUP INC.;

22 | MBIA INC.;

23 | XL CAPITAL ASSURANCE INC.;

24 | FINANCIAL GUARANTY
INSURANCE COMPANY;

25 | CIFG ASSURANCE NORTH

26 | AMERICA, INC.;

27 | JASON KISSANE;

Case No. _____

COMPLAINT FOR:

(1) BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING;
(2) FRAUD AND DECEIT;
(3) BREACH OF CONTRACT;
(4) NEGLIGENT MISREPRESENTATION;
(5) NEGLIGENCE; and
(6) VIOLATIONS OF CARTWRIGHT ACT (CAL. BUS. & PROF. CODE §§ 16720 *et. seq.*);

**JURY TRIAL DEMANDED**

28 |

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

COMPLAINT

1  NEIL PACK;

2  and

3  DOES 1 - 50.

4            Defendants.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**COMPLAINT**

# TABLE OF CONTENTS

**Pages**

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  NATURE OF THE ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III. JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.  PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.   Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    B.   Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.   Doe Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    D.   Credit Rating Agencies . . . . . . . . . . . . . . . . . . . . . . . . . 11

    E.   Agents and Co-Conspirators . . . . . . . . . . . . . . . . . . . . . 12

V.   WRONGDOING CENTERED IN SAN FRANCISCO . . . . . . . . . . 13

VI.  OVERVIEW OF THE MUNICIPAL BOND MARKET . . . . . . . . . 14

    A.   Municipal Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    B.   History of Bond Ratings . . . . . . . . . . . . . . . . . . . . . . . . 15

    C.   History of Municipal Bond Insurance . . . . . . . . . . . . . . 16

    D.   Auction-Rate Securities . . . . . . . . . . . . . . . . . . . . . . . . . 17

VII. THE DEFENDANTS HAVE ENGAGED IN UNLAWFUL
     CONDUCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    A.   Municipal Bonds are Rated by Credit Rating Agencies . . . . . . . . . 20

    B.   Wrongdoing in the Bond Insurance Industry . . . . . . . . . . . . . . . . . 24

    C.   The Bond Insurance Companies Reap Illegal Profits . . . . . . . . . . 25

    D.   Conspiracy in the Bond Insurance Industry . . . . . . . . . . . . . . . . . 26

    E.   The Defendants Failed to Disclose Their True Financial Condition
       and Risk Exposure to Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    F.   Auction-Rate Bonds Have Been the Hardest Hit by the Deception   38

       1.   Plaintiff City of Oakland Issued Auction-Rate Bonds . . . . . . 38

       2.   Auction-Bond Failures Caused by Bond
          Insurer Downgrades . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

VIII. CREDIT RATING AGENCIES ADMIT THE FLAWED NATURE
OF THE DUAL RATING SYSTEM .......................... 42

IX. INDUSTRY ASSOCIATIONS USED FOR CONSPIRACY ........ 45

X. CALIFORNIA PUBLIC ENTITIES SUCH AS OAKLAND
SUFFERED INJURY THROUGH THE CONDUCT OF THE
DEFENDANTS ......................................... 47

XI. GOVERNMENT INVESTIGATIONS INTO THE
DUAL RATING SYSTEM IN THE BOND MARKET ........... 48

XII. FRAUDULENT CONCEALMENT .......................... 50

XIII. CLAIMS FOR RELIEF ................................. 51

FIRST CAUSE OF ACTION
BREACH OF THE COVENANT OF GOOD FAITH
AND FAIR DEALING .................................. 51

SECOND CAUSE OF ACTION
FRAUD AND DECEIT.................................. 52

THIRD CAUSE OF ACTION
BREACH OF CONTRACT .............................. 53

FOURTH CAUSE OF ACTION
NEGLIGENT MISREPRESENTATION ..................... 54

FIFTH CAUSE OF ACTION
NEGLIGENCE ....................................... 55

SIXTH CAUSE OF ACTION
VIOLATIONS OF CALIFORNIA CARTWRIGHT ACT ......... 56

PRAYER FOR RELIEF ................................... 57

JURY TRIAL DEMAND .................................. 59

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                              ii

1    Plaintiff City of Oakland (hereinafter referred to as "Oakland"), hereby

2   brings this action for damages and relief against the Defendants (defined *infra)* for

3   violations of California state common law and for violations of the California

4   Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, *et. seq.*).  Plaintiff complains

5   and alleges upon information and belief except as to those paragraphs applicable

6   to the Plaintiff, which are based on personal knowledge, as follows:

7                                   **I.**

8                          **INTRODUCTION**

9        1.    This case involves the municipal bond insurance industry used by

10   California municipalities to assist in the funding of public projects.  California

11   public entities spent hundreds of millions of dollars to buy bond insurance in order

12   to sell municipal bonds needed for important public purposes, such as building

13   schools, roads and hospitals.  The unlawful acts of the Defendants have

14   perpetuated an unfair dual rating system that forced public entities to buy bond

15   insurance, at the cost of hundreds of millions of taxpayer dollars.  California

16   public entities, including Oakland, should not have had to buy that bond

17   insurance.

18        2.    The situation however reached disaster levels when those same bond

19   insurance companies, who took **hundreds of millions** of dollars in premiums from

20   California public entities, then insured **hundreds of billions** of dollars of

21   *subprime loans.*  The insurer Defendants never disclosed the extent of their

22   exposure to the subprime market but rather represented to Plaintiff Oakland and

23   other California public entities that the bond insurance they were selling would

24   improve their credit rating and lower the interest rate they would have to pay.  In

25   that way, the Defendants sold worthless bond insurance.

26        3.    "We know there was a concerted effort among supposed competitors

27   to maintain the dual rating system and kill attempts at reform.  There were

28   discussions amongst insurers aimed at retaining the dual rating system when at

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1 least one rating agency suggested modifying or eliminating it. **The effect of these**
2 **activities was clearly to maintain prices and prop up the market for bond**
3 **insurance. Such misuse of market power and restraint of competition is**
4 **plainly anticompetitive and anti-taxpayer, causing direct harm to municipal**
5 **and state customers issuing bonds.**" Connecticut Attorney General in testimony
6 before the House Committee on Financial Services on March 12, 2008.

7     4.    "For years, municipalities have been held to a higher standard than
8 corporate issuers. This differential treatment undermines the functioning of an
9 efficient and transparent capital market, a goal shared not just by investors and
10 issuers, but rating agencies as well. For investors, the current system greatly
11 inflates the risk of investing in municipal bonds relative to alternative investments,
12 leading to investment decisions that are not based on the best information. For
13 municipalities, the dual standard has **cost our taxpayers and ratepayers billions**
14 **of dollars** in increased interest costs and bond insurance premiums." Letter from
15 Hon. Bill Lockyer of California and 15 State Treasurers to Fitch Ratings, Moody's
16 Investor Services and Standard & Poor's dated March 4, 2008.

17     5.    States, municipalities and public entities issue bonds to fund critical
18 public projects like bridges, schools, roads, sewer plants, libraries, prisons and
19 drinking water systems. The interest rate paid on these bonds depends mainly on
20 the ratings assigned to the bonds by the Credit Rating Agencies. A bond rated
21 "AAA" will bear a lower interest rate than a bond rated "A." As such, the
22 taxpayers in a municipality with an "A" rating will pay substantially more interest
23 over the life of the bond, which can range up to 30 years. This constitutes a
24 significant cost to public entities, many of which rely extensively on municipal
25 bond proceeds to finance public works.

26     6.    Bond ratings are a grade given to bonds that indicate their credit
27 quality. The three major bond rating agencies in the country, **Fitch Inc., Moody's**
28 **Corporation,** and **Standard & Poor's** ("Credit Rating Agencies"), provide these

COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                  2

1 evaluations which are supposed to be based upon bond issuer's financial strength,
2 or its ability to pay a bond's principal and interest in a timely fashion. Bond
3 ratings are expressed as letters ranging from "AAA," which is the highest grade, to
4 "C" (junk), which is the lowest grade. The rating services all use letter grades, but
5 use various combinations of upper- and lower-case letters to differentiate
6 themselves.

7      7.      In order for municipal entities to sell bonds at lower interest rates,
8 they are often required to enter into agreements with **bond insurance companies.**
9 In California, the largest municipal bond insurance companies that formerly had
10 AAA ratings are Ambac Financial Group, Inc., MBIA Inc., XL Capital Assurance,
11 Inc., Financial Guaranty Insurance Company, and CIFG Assurance North
12 America, Inc. (the "Insurer Defendants"). The bond insurance company provides
13 a guarantee that they will cover interest payments and the principal payment if the
14 issuer defaults. This serves to lower the interest rate on a municipal bond
15 issuance. For this "service," the Defendant bond insurance companies collect a
16 fee from the public entities.

17      8.      In simple terms, a public entity and a corporate entity may have the
18 same likelihood of defaulting on their debt. The purpose of a bond rating is to
19 inform investors of the likelihood of default on loans by different entities. As a
20 result of different rating systems, however, these two entities, who are otherwise
21 similar, may receive different ratings, *e.g.* the public entity may be rated "A" while
22 the corporate entity may be rated "AAA." Despite the fact that these entities
23 possess the same default risk, the public entity's borrowing costs are significantly
24 higher then the corporate entity. This is the result of the dual bond rating system
25 created by the Credit Rating Agencies which is now the subject of great debate
26 and investigation.

27      9.      Through this discriminatory system, public entities have been forced,
28 and the taxpayers who support those public entities, to pay the insurer Defendants

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                    3

1  unnecessary insurance premiums.  The difference between an uninsured bond
2  issuance and an insured bond issuance for a municipal entity below "AAA"
3  (which virtually all are) can amount to millions of dollars in increased interest paid
4  to the purchasers of the bonds.  California municipalities and public entities are
5  forced to either pay higher interest rates on the issuance of a bond or pay
6  premiums to bond insurance companies.  The Defendants conspired to maintain
7  that dual rating system because they knew it was the backbone of their entire
8  industry.

9      10.    The insurer Defendants are corporate insurance entities that are (or at
10  least were) rated "AAA" under the corporate standard.  When the insurer
11  Defendants insure a bond offering their credit rating is attributed to the bond
12  rather than the credit rating of the issuer.  In essence, a public entity with a lower
13  default risk (the more trustworthy entity) has to pay the bond insurance company
14  (the less trustworthy entity) millions of dollars in insurance premiums in order to
15  receive the benefit of lower interest rates.  This situation is not economically
16  rational and serves as a detriment to public entities and has led to unnecessarily
17  high borrowing costs for public entities and unlawful profits for the insurer
18  Defendants.

19      11.    Insuring municipal bonds is an extremely low-risk business in which
20  the insurer Defendants basically receive hundreds of millions of dollars for **doing**
21  **nothing** as municipalities rarely, if ever, default.  The default rate for municipal
22  bonds is minuscule in comparison to corporations — the municipal bond default
23  rate is 0.06 while the default rate on corporate bonds is 0.30 nationally over the
24  past decade.  In other words, corporate bonds, in general, are **five times** more
25  likely to default than are municipal bonds.

26      12.    Most bond insurance companies would not even insure California
27  public entities that had even a remote risk of default.  The Securities Industry and
28  Financial Markets Association Web site indicates that the insurer Defendants

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                4

1  followed a "zero-loss" underwriting standard, in essence only insuring those

2  municipal bonds that had a **zero percent** chance of defaulting and collecting fees

3  to insure those bonds.

4      13.   This demanding standard that the insurer Defendants have levied

5  against the Plaintiff and other California public entities is in complete contrast to

6  their own irresponsible behavior in insuring hundreds of billions of dollars of high

7  risk subprime mortgage instruments and other complex leveraged instruments

8  based on subprime mortgage instruments.

9      14.   The recent wave of downgrades of all of the insurer Defendants

10  demonstrates that the municipal bond insurance industry has been built on a

11  deceptive foundation. All of the insurer Defendants not only insured the safe debt

12  of public entities such as the Plaintiff Oakland, but recently started insuring risky

13  subprime loans and structured financial products based on those subprime loans,

14  including Collateralized Debt Obligations ("CDO"), all in the name of greed. At

15  the end of 2007, bond insurance companies backed at least **$127 billion of CDOs**

16  based on subprime loans. When these subprime loans began to fail, the risk

17  incurred by the insurer Defendants in insuring these CDOs became starkly visible.

18  Accordingly, as the credit ratings of the insurer Defendants were downgraded, the

19  rating of bond issuances insured by the insurer Defendants were also downgraded.

20  The insurer Defendants' highly risky involvement in the subprime markets was

21  **never disclosed** by the Defendants to Plaintiff Oakland and other California cities

22  and municipalities. If they had known that the insurer Defendants had billions of

23  dollars in exposure to risky subprime and subprime-related instruments, Plaintiff

24  **would not** have purchased bond insurance that has become basically worthless.

25      15.   With the revelation of the recent collapse of the subprime market and

26  the security instruments that were based on the subprime market, the financial

27  conditions of all of the insurer Defendants have suffered. The extent of the insurer

28  Defendants' extremely risky investments in subprime mortgage-backed securities

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                   5

1  and insurance of risky subprime loans were never disclosed to the Plaintiff. Even
2  now, the news on a daily basis reveals more and more about the inability of the
3  bond insurance companies to support the promises they made to Oakland and
4  other California public entities. The insurer Defendants have all seen their credit
5  ratings drop recently and at least two have dropped to junk status. The municipal
6  entities have proven to be far less likely to default than the insurance companies
7  that they paid to guarantee their debt. In short, Plaintiff paid insurance premiums
8  for nothing.

9      16.    As bond insurance companies, the insurer Defendants were
10  motivated to: (a) artificially lower the credit ratings of bond issuers (*i.e.*
11  municipalities and cities); (b) maintain their own high credit rating and (c) charge
12  high premiums for bond insurance. The insurer Defendants' entire business model
13  rested on these predicate facts. Without one or the other, the insurer Defendants
14  would not be able to receive the high premiums from Plaintiff Oakland and other
15  California municipal and public entities. The first goal was achieved by
16  conspiring to misuse their dominant control of the bond insurance market to
17  perpetuate and maintain the dual bond rating system. The second goal was
18  achieved by failing to disclose their true risk profile by recklessly endangering
19  their "AAA" status by insuring subprime loans and investing in exotic subprime
20  financing instruments.

21      17.    The insurer Defendants misled Plaintiff Oakland by failing to disclose
22  the full extent of their investment in subprime mortgage-backed securities and
23  their insurance of subprime instruments. Those agreements greatly jeopardized
24  the financial condition of the insurer Defendants. As a direct result of being
25  misled, Plaintiff entered into bond insurance agreements with entities that were in
26  substantially worse financial condition than California public entities, such as
27  Plaintiff Oakland, believed. As such, Plaintiff suffered harm from paying
28  unnecessary premiums and costs for bond insurance from financially weak

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                    6

companies. Plaintiff Oakland paid a premium to acquire a certain product (insurance from a triple-A rated entity) that, due to the wrongdoing of the Defendants, is no longer the same product it thought it had acquired.

## II.

## NATURE OF THE ACTION

18.   This action arises from the illegal and unlawful acts of the Defendants in selling bond insurance to Oakland while offering little or no benefits in reality. The Defendants conspired to maintain and perpetuate the dual rating system in order to force California public entities to purchase bond insurance. The Defendants compounded this wrongdoing by recently insuring hundreds of billions of dollars of subprime loan instruments and failing to disclose that fact to the Plaintiff and other California public entities.  These two factors combined to cause great harm to Plaintiff Oakland, forcing them to spend millions of taxpayer dollars for worthless bond insurance. As a result, Plaintiff paid unnecessary premiums and costs because of the conduct of the insurer Defendants.

19.   The misconduct of the Defendants was solely for the financial benefit of the Defendants. In the face of the downgrading of the insurer Defendants, Moody's and Fitch have now all but admitted that the dual rating system is flawed and are overhauling and updating all of their municipal bond ratings. Initial estimates suggest that a large number of municipalities and public entities that were formerly below "AAA" (and thus had to buy bond insurance) will be rated "AAA." Standard & Poor's has now upgraded more then 5,000 municipal bonds and has indicated further upgrades may be forthcoming. This dual rating system, which was illegally propped up by the bond insurance companies, was unfair. Even accepting the system as unfair, the insurer Defendants had no business exposing themselves to hundreds of billions of dollars of high risk sub-prime liability while simultaneously insuring municipal bonds.

## III.

## JURISDICTION AND VENUE

20.    Defendants, and each of them, are subject to the jurisdiction of this Court by virtue of their business dealings and transactions in California, by having caused injuries through their acts and omissions throughout the State of California, and by their violation of California state common law and the Cartwright Act, Business & Professions Code §§ 16700, *et seq.*

21.    This Court has subject matter jurisdiction over all causes of action asserted herein pursuant to Article VI, § 10 of the California Constitution. Each cause of action asserted, including claims alleging violations of the Cartwright Act, arises exclusively under the laws of the State of California. No part of this complaint arises under federal law, is preempted by federal law, implicates any filed rate, or challenges conduct within any federal agency's exclusive domain, and adjudication thereof has not been statutorily assigned to any other court or jurisdiction.

22.    The damages suffered by the Plaintiff exceed this Court's jurisdictional minimum.

23.    Each Defendant has sufficient minimum contacts within California to make the exercise of jurisdiction over each Defendant by California courts consistent with traditional notions of fair play and substantial justice. Each Defendant participates, or during the relevant period did participate, in the California market through the sale of municipal bond insurance to California state and local municipalities and public entities.

24.    Venue is proper because certain of the Defendants resided, transacted business, were found, or had agents in this county, and because Plaintiff's claims arise directly from business conducted in the City and County of San Francisco. Several of the Defendants are citizens of the State of California, including Defendants Jason Kissane and Neil Pack. All of the Defendants do substantial

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                                    8

1  business in the State of California and are thus subject to personal jurisdiction in
2  California state court. The Plaintiff in this action is a California public entity that
3  has suffered financial losses due to the illegal and unlawful conduct of the
4  Defendants. The monies lost are those of Oakland residents.

5                                    **IV.**

6                                 **PARTIES**

7  **A.    Plaintiff**

8        25.    Plaintiff **City of Oakland ("Oakland")** is a California public entity
9  that has issued municipal bonds and has bought municipal bond insurance from
10 one or more of the insurer Defendants. For example, the City of Oakland
11 purchased bond insurance from XL Capital Assurance, Inc., whose credit rating
12 has recently sunk beneath the City of Oakland's own credit rating of 'A1." The
13 City of Oakland has been subject to the dual rating system, under which Oakland
14 was required to buy bond insurance in order to issue bonds at reasonable interest
15 rates. Oakland has suffered losses from the acquisition of bond insurance from the
16 Defendants. Finally, Oakland has had to endure higher interest rates because of
17 the failing financial conditions of the Defendants. Plaintiff alleges that the
18 premiums that it was forced to pay in order to acquire bond insurance was subject
19 to the unlawful and illegal acts of the Defendants.

20 **B.    Defendants**

21       26.    **Ambac Financial Group Inc. ("Ambac")** is a Delaware corporation
22 with its principal place of business in New York, NY. Ambac's principal
23 operating subsidiary, Ambac Assurance Corporation, is a guarantor of public
24 finance and structured finance obligations. Ambac sold bond insurance to
25 Oakland in the State of California. Ambac is one of the largest providers of
26 municipal bond insurance in the State of California.

27       27.    **MBIA Inc. ("MBIA")** is a Connecticut corporation with its principal
28 place of business in Armonk, NY. MBIA sold bond insurance to Oakland in the

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**COMPLAINT**                                                              9

1  State of California and is one of the largest providers of municipal bond insurance
2  in the State of California.

3      28.   **XL Capital Assurance Ltd. ("XL Capital")** is a wholly-owned
4  subsidiary of Security Capital Assurance Ltd. Its principal place of business is
5  located in New York, NY. XL Capital sold bond insurance to Oakland in the State
6  of California. XL and its parents and subsidiaries are one of the largest providers
7  of municipal bond insurance in the State of California.

8      29.   **Financial Guaranty Insurance Company ("FGIC")** is a New York
9  corporation with its principal place of business in New York, NY. FGIC is a
10  subsidiary of FGIC Corporation, a Delaware corporation. FGIC sold bond
11  insurance to Plaintiff Oakland in the State of California and is one of the largest
12  providers of municipal bond insurance in the State of California.

13      30.   **CIFG Assurance North America, Inc. ("CIFG")** is a New York
14  corporation with its principal place of business at 825 Third Avenue, 6th Floor,
15  New York, NY 10022. CIFG is a subsidiary corporation of CIFG Guaranty, Ltd.,
16  a French *societe anonyme*. CIFG sold bond insurance to California public entities
17  in the State of California and is one of the largest providers of municipal bond
18  insurance in the State of California.

19      31.   **Jason Kissane ("Kissane")** is a citizen of California and is a
20  managing director of MBIA's Global Public Finance Division and head of the
21  company's San Francisco office. As the head of MBIA's San Francisco office,
22  Mr. Kissane oversees MBIA's new business activities in the western region of the
23  United States and manages MBIA's insurance business in the western United
24  States including that of Oakland. As managing director of MBIA's Global Public
25  Finance Division, Mr. Kissane knew of MBIA's actual exposure to the subprime
26  markets, an exposure that jeopardized the insurance product he and his division
27  were selling to California public entities. Mr. Kissane also knew and acted in

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1  concert with the other Defendants to maintain the dual rating system.  Mr. Kissane
2  is a resident of San Francisco.

3      32.    **Neil Pack ("Pack")** is a citizen of California and is the managing
4  director and head of the US Public Finance - Western Region division of
5  Defendant CIFG.  Mr. Pack operates out of CIFG's office in San Francisco,
6  California.  Prior to joining CIFG, Mr. Pack spent five years as a managing
7  director at Defendant XL Capital.  Mr. Pack is responsible for CIFG's municipal
8  bond insurance business in the western United States including that of Oakland.
9  As a managing director at both Defendant XL Capital and Defendant CIFG, Mr.
10  Pack knew of the massive exposure to the subprime markets that both Defendant
11  XL Capital and Defendant CIFG possessed, an exposure that jeopardized the
12  product he and his division was selling to California public entities.  Mr. Pack also
13  knew and acted in concert with the other Defendants to maintain the dual rating
14  system.  Mr. Pack is a resident of Contra Costa County.

15      33.    **Ambac, MBIA, XL Capital, FGIC, CIFG, Kissane and Pack** are
16  referred to throughout as the **Defendants**.

17  **C.**    **Doe Defendants**

18      34.    Except as described herein, Plaintiff is ignorant of the true names of
19  Defendants sued as Does 1 through 50 inclusive and, therefore, sues these
20  Defendants by such fictitious names.  Plaintiff will seek leave of the Court to
21  amend this Complaint to allege their true names and capacities when they are
22  ascertained.

23      35.    Plaintiff alleges that each of these Doe Defendants is responsible in
24  some manner for the acts and occurrences alleged herein, and that Plaintiff's
25  damages were caused by such Doe Defendants.

26  **D.**    **Credit Rating Agencies**

27      36.    **Fitch Inc. ("Fitch")**, which does business in California as Fitch
28  Ratings, is a Delaware corporation with headquarters in New York, NY and in

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT          11

1  London, England. Fitch is part of the Fitch Group, which is a subsidiary of

2  France-based Fimalac. Fitch is one of the three major municipal bond rating

3  agencies.

4      37.    **Moody's Corporation ("Moody's")** and its subsidiary Moody's

5  Investors Service, Inc. are Delaware corporations with their principal place of

6  business in New York, NY. Moody's is one of the three major municipal bond

7  rating agencies.

8      38.    **Standard and Poor's ("S&P")** is a division of McGraw-Hill

9  Companies, Inc. and has its principal place of business in New York, NY. S&P is

10  one of the three major municipal bond rating agencies.

11     39.    Fitch, Moody's and S&P are referred to throughout as the **Credit**

12  **Rating Agencies.**

13  E.    **Agents and Co-Conspirators**

14     40.    At all times relevant to this complaint Defendants, and each of them,

15  were acting as the agents, employees, and/or representatives of each other, and

16  were acting within the course and scope of their agency and employment with the

17  full knowledge, consent, permission, authorization and ratification, either express

18  or implied, of each of the other Defendants in performing the acts alleged in this

19  complaint.

20     41.    As members of the conspiracies alleged below, each of the

21  Defendants participated and acted with or in furtherance of said conspiracy, or

22  aided or assisted in carrying out the purposes of the conspiracy, and have

23  performed acts and made statements in furtherance of the conspiracy and other

24  violations of California law.

25     42.    Each of the Defendants acted both individually and in alignment with

26  other Defendants with full knowledge of their respective wrongful conduct. As

27  such, the Defendants conspired together, building upon each other's wrongdoing,

28  in order to accomplish the acts outlined in this complaint.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**COMPLAINT**                                                                 12

43.    Defendants are individually sued as principals, participants, and aiders and abettors in the wrongful conduct complained of and the liability of each arises from the fact that each has engaged in all or part of the improper acts, plans, schemes, conspiracies, or transactions complained of herein.

## V.

## WRONGDOING CENTERED IN SAN FRANCISCO

44.    Plaintiff Oakland has suffered great harm from the wrongful acts of the Defendants. California is the largest municipal bond issuer in the United States with about $43.7 billion of general obligation debt outstanding. According to the California State Treasurer, in 2007 alone, the State of California sold $12.1 billion of general obligation bonds. Add the outstanding general obligation debt of California cities, counties, districts and other public entities, and it is easily the biggest and most lucrative market in the country for municipal bond insurance. As such, the totality of the harm addressed in this complaint has been suffered by California taxpayers and the residents of Oakland in particular.

45.    All of the insurer Defendants conduct a good portion of their business in San Francisco. Indeed, while formally headquartered across the world, all of the insurer Defendants conduct significant business in California. Due to the sheer size of the California municipal bond market, all of the insurer Defendants operate in the State of California and the majority of the Defendants operate major offices in the **financial district of San Francisco**. It is here that the locus of the unlawful conduct against California cities and municipalities is directed from. For example:

46.    **MBIA Inc.** registered on June 29, 1989 with the California Secretary of State. MBIA maintains a California office at **150 California Street, 20th Floor, San Francisco, CA 94111.** According to the MBIA website, the San Francisco office is the home of MBIA's Global Public Finance Division. The San Francisco

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1 office is responsible for MBIA's marketing and insurance operations in the
2 western United States including Plaintiff Oakland.

3     47.   **XL Capital Assurance Inc.** registered on October 10, 2001 with the
4 California Secretary of State. XL Capital Assurance Inc. maintains a California
5 office at **595 Market Street, Suite 2210, San Francisco, CA 94105.**

6     48.   **CIFG Assurance North America, Inc.** registered as a business
7 entity on September 17, 2003 with the California Secretary of State. CIFG
8 Assurance North America, Inc. maintains a California office at **Spear Tower, One
9 Market Street, Suite 3500, San Francisco, CA 94105.**

10    49.   **Ambac Assurance Corporation** registered on September 28, 1971
11 with the California Secretary of State.

12    50.   **Financial Guaranty Insurance Company** registered on July 28,
13 1972 with the California Secretary of State.

14                                   **VI.**

15            **OVERVIEW OF THE MUNICIPAL BOND MARKET**

16 **A.    Municipal Bonds**

17    51.   Municipal bonds are issued by Oakland and other California cities
18 and counties to raise funds for various public projects, including the construction
19 and repair of roads and building public structures such as schools, parks, power
20 plants and mass transit. Municipal bonds are tax-exempt and as a result, investors
21 are usually willing to accept lower interest rates from municipal bonds then they
22 would accept from other forms of borrowing (assuming comparable risk).

23    52.   Municipal bonds bear interest at either a fixed or variable rate of
24 interest. The issuer of a municipal bond receives the proceeds of the bond at the
25 time of issuance. In return, the issuer agrees to repay the principal and the interest
26 to the bond holders over time. Repayment periods vary and may be as short as a
27 few months but typically last for several years.

28

53.   There are various types of municipal bonds.  General obligation bonds are a form of long term borrowing that is backed by a public entity's general fund, including its power to levy taxes.  Revenue bonds are a form of long-term borrowing in which the debt obligation is generally not backed by the public entity's general fund, but is instead secured by a revenue stream produced by the project being financed or by a municipal enterprise such as an airport or a water sewer system.  Lease-revenue bonds are a variant of revenue bonds used in the state's capital outlay program and also by Oakland.  The revenue stream backing the bond is usually created from lease payments made by the occupying department to the governmental financing entity which constructs the facility.  The financing authority constructs the facility, issues financing bonds, and retains title to the facility until the debt is retired.

54.   The municipal bond industry is extremely large.  According to the Securities Industry and Financial Markets Association, approximately $385 billion worth of municipal bonds were issued in 2006.  The total United States municipal bond market is currently valued at approximately $2.6 trillion.  At any time, California has several thousand bond issuances outstanding.  The total market value of the California bond market is approximately $200 billion.  In the last year, it is estimated that public entities in California issued approximately $20 billion of municipal bonds.

**B.   <u>History of Bond Ratings</u>**

55.   In 1909, John Moody introduced a simple grading system for railroad bonds, which was broadened a few years later to include all industrial bonds.  John Moody's grading system was one of the precursors to the modern system of rating security instruments.

56.   Poor's Publishing was second in the business in 1916; Standard Statistics followed in 1922.  The two companies merged in 1941, forming Standard & Poor's, which was absorbed by McGraw-Hill in 1966.  In 1924, Fitch

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1   Publishing made its entrance into the industry. The value of the ratings companies
2   for investors was based on the theory that ratings provided by presumptively
3   objective voices of expertise would assist bond investors in determining which
4   companies were good credit risks and which were bad risks.

5         57.    The 1930s brought the first major change that affected the industry.
6   In the early 1930s, bank regulators began to make judgements about the soundness
7   of banks based on the quality of corporate bonds in which the banks had invested.
8   By 1936, regulators had settled on a requirement that banks could not invest in
9   bonds that were below "investment grade." These changes in bank regulation
10  were followed in the 1930s and 1940s by changes in state regulatory requirements
11  for insurance companies that linked those firms' capital requirements to the ratings
12  of the bonds in the companies' investment portfolios.

13        58.    The next major change for the industry came in the early 1970s,
14  when the industry changed its business model from the "investors pay" model to
15  an "issuers pay" model. The other changes of the 1970s occurred in 1975. The
16  SEC wanted to use bond ratings as a basis for credit quality determinations.
17  Therefore, the SEC created a new regulatory category, "nationally recognized
18  statistical rating organizations" (NRSROs). The three rating company incumbents,
19  Moody's, S&P and Fitch, were immediately "grandfathered" into the NRSRO
20  category. For the next 25 years, the SEC designated only four additional firms as
21  NRSROs. However, mergers among them reduced the net number of NRSRO
22  firms back to the **original three.**

23  **C.    History of Municipal Bond Insurance**

24        59.    Bond insurance is a service where the issuer of a bond can pay a
25  premium to a third party bond insurer, who guarantees repayment of interest and
26  principal as specified in the bond in the event that the issuer fails to do so. This in
27  turn raises the rating of the bond to the rating of the insurer. The bond insurer's
28  credit rating must be very good in order for this to happen. The premium

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**COMPLAINT**                                                                16

1 requested for insurance on a bond is a measure of the perceived risk of failure of

2 the issuer. Municipal bond insurance was introduced in the US in the early 1970's.

3      60.    The first monoline insurer, Ambac Financial Group, Inc., was formed

4 in 1971 as an insurer of municipal bonds. The second major monoline insurer,

5 MBIA, Inc. was formed in 1973. Today, Ambac and MBIA are the largest

6 insurers of municipal bonds in California.

7      61.    In recent years, much of the monolines' growth has come through

8 insuring structured products, such as asset backed bonds and collateralized debt

9 obligations (CDOs), and the total outstanding amount of paper insured by

10 monolines reached $3.3 trillion in 2006. By insuring these risky investments, the

11 municipal bond insurers seriously jeopardized their own creditworthiness and

12 created problems for the California public entities that purchased insurance from

13 them, as detailed below.

14 **D.**    **Auction-Rate Securities**

15      62.    Auction rate securities ("ARS") are instruments, typically long-term

16 bond investments with characteristics of a short-term investment built into the

17 instrument through the auction mechanism. As a result, underwriters and other

18 brokers have pitched ARS to issuers as securities with long-term maturities but

19 which function as cash equivalents. ARS can consist of municipal bonds,

20 corporate bonds, and preferred stock funds. Historically, ARS have primarily

21 been municipal bonds in which the issuers include states, cities, hospitals, water

22 districts and schools. With the benefit of bond insurance, many of these ARS

23 instruments were "AAA" rated.

24      63.    ARS underwriting firms and other financial institutions presented

25 ARS investments to issuers as a way to take advantage of lower short-term interest

26 rates, even on long-term debt issues. Issuers were informed that auctions would

27 not fail, especially with the backing of "AAA" rated bond insurance companies.

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                  17

1  Issuers looked to ARS instruments as a way to obtain short-term interest rates on
2  long term debt issues.

3      64.    Depending on the specifics of the ARS documents, interest rates are
4  reset typically every 7, 14, 28 or 35 days. Existing holders of ARS securities and
5  potential investors periodically reset the interest rate on a security's coupon
6  through a formalized bidding process known as a "Dutch Auction" or reverse
7  auction. In the Dutch Auction, the interest rate is initially set at a presumably
8  economically unattractive level and then made more attractive to purchasers
9  throughout the course of the auction. Bids are typically offered until all the
10 securities at the auction are sold. In this manner, the Dutch Auction theoretically
11 establishes the equilibrium rate at which supply equals demand. This process
12 continues every 7, 14, 28 or 35 days, depending on the specific structure of any
13 given Dutch Auction. The period of time between Dutch Auctions is commonly
14 referred to as the "holding period."

15     65.    In a standard Dutch Auction, bidders are permitted to enter 1 of 4
16 different orders:

17          (1)    Hold Order (keep the shares out of the auction regardless
18                 of the new interest rate).

19          (2)    Hold at Rate Order (sell the shares only if the clearance
20                 rate is lower than the bid to hold rate).

21          (3)    Sell Order (sell the shares regardless of the clearance rate).

22          (4)    Bid Order (buy a new position at a specific interest rate).

23     66.    If a bidder "wins" the auction, he or she is required to purchase the
24 bond and is entitled to receive interest at the auction's "clearing rate."

25     67.    The rate at which all securities were sold is called the "clearing rate."
26 The point at which the last available security is allocated to the lowest remaining
27 bidder triggers the clearing rate. The clearing rate will apply to the entire block of
28 securities, even though the rate may be higher than the lowest bid. If several

1  bidders have bids at the clearing rate, and there are more bids than shares, the
2  shares are divided pro-rata between the clearing rate bidders.

3       68.    For example, a hypothetical ARS sale for $100,000 contains four buy
4  bids:

5       •      Bid A was for $50,000 at 1.10%.

6       •      Bid B was for $50,000 at 1.15%.

7       •      Bid C was for $50,000 at 1.15%

8       •      Bid D was for $25,000 at 1.20%

9       69.    Here, the "clearing rate" would be 1.15%, *i.e.* the lowest rate that
10  would cover all the securities for sale in the auction. (The 1.10% rate, though
11  lower, is not enough to cover all the securities as Bid A was only for $50,000, ½
12  of the securities up for sale). Bid A would receive $50,000 worth of ARS at
13  1.15% Bids B and C would receive pro-rate allocations of $25,000 each at 1.15%.
14  Bid D would receive no allocation.

15      70.    If there are insufficient buyers, an auction can fail. For municipal
16  bond issuers, a key factor in the prevention of failed auctions was the fact that
17  municipal bonds had "AAA" ratings because of bond insurance. However, in the
18  last several months, many auctions for ARS failed, to the detriment of California
19  municipal issuers such as the Plaintiff. Potential investors worried that auction
20  bonds would be downgraded because of the bond insurer's exposure to the
21  subprime market and other exotic financial products, such as CDOs. Potential
22  investors also worried about ARS becoming illiquid (*i.e.* not being able to sell the
23  ARS) due to failed auctions.

24      71.    When auctions fail, the clearing interest rate for the ARS cannot be
25  set through the auction, and instead is set by a formula contained in the bond
26  documents. Typically, in such a scenario, the interest rate on the municipal bond
27  skyrockets. In many cases, when auctions fail, the interest rate on ARS securities
28  reach double digits. In 2005, the City of Oakland issued approximately $145

1 million in ARS revenue bonds that was insured by XL Capital. When XL
2 Capital's insurance rating dropped, the auctions failed and during the time of the
3 auction failure, the City of Oakland was paying 12% interest payments. For many
4 entities like the City of Oakland, interest rates have entered double digits, costing
5 California public entities hundreds of millions of dollars in extra interest
6 payments.

7                                        VII.

8        **THE DEFENDANTS HAVE ENGAGED IN UNLAWFUL CONDUCT**

9        72.    The insurer Defendants have conspired to maintain the dual rating
10 system and thwart any attempts to reform the system. The insurer Defendants, not
11 content to take advantage of the dual rating system to sell bond insurance, also
12 collected millions of dollars in premiums in order to insure billions of dollars of
13 subprime-based instruments. At first, the insurer Defendants collected record
14 profits. However, as the subprime loans defaulted, the insurer Defendants found
15 their financial condition seriously jeopardized and the product they sold to the
16 Plaintiff Oakland becoming worthless in many respects.

17 **A.    Municipal Bonds are Rated by Credit Rating Agencies**

18       73.    Municipal bonds are given bond ratings by the Credit Rating
19 Agencies. These bond ratings have a direct effect on the interest rates that
20 California public entities can obtain from the sale of municipal bonds. These bond
21 ratings directly affect the borrowing costs of California public entities, including
22 the Plaintiff. As a result of the dual bond rating system, Oakland was forced to
23 purchase unnecessary bond insurance from the insurer Defendants (because it was
24 unfairly rated lower than corporate entities)

25       74.    According to economists and reports generated by the Credit Rating
26 Agencies, S&P and Moody's each control 40% of the credit rating market. Fitch
27 controls 15%. The three entities combined control approximately 95% of the
28 credit rating market.

75.    Rating agencies have held municipal bond issuers to a higher standard than corporate issuers. Unlike corporate issuers, municipal bond issuers are not graded on the risk of default. Municipal entities in general rarely, if ever, default. Nonetheless, public entities issuing municipal bonds are universally given lower bond ratings than similar corporate bonds. This disparity is not merely cosmetic. In fact, it costs California taxpayers hundreds of millions of dollars in the form of either higher interest rates or in the form of premiums and costs related to acquiring municipal bond insurance.

76.    The dual system of bond ratings is misleading and misguided – costing California taxpayers billions of dollars in high interest rates and unnecessary costs and premiums. If investors were properly informed of the significantly lower risk of default on municipal bonds, Plaintiff Oakland and other California cities and municipalities would not have to buy municipal bond insurance.

77.    As a result of the credit rating system it is impossible for any municipality to publicly sell a bond without a rating. In addition, the market generally made it cost-prohibitive to issue a bond without a "AAA" rating. Hence, the need to buy bond insurance. In essence, the dual rating system created by the Credit Rating Agencies and perpetuated by the Defendants serves the sole purpose of propping up the market for bond insurance. As such, the Defendants have every economic motive and incentive to conspire to maintain and perpetuate the dual rating system. Without it, the entire core business model of the bond insurance companies (a core business model they abandoned) fails.

78.    According to the *Los Angeles Times*, tax-free, fixed-rate general obligation bonds issued by cities, counties and local government agencies are generally so safe that all would be rated "AAA" if judged on the same scale as corporate bonds by the Credit Rating Agencies. Moody's recent announcement that it may align municipal bond ratings with corporate ratings included an

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

acknowledgment that thousands of cities and municipalities would be upgraded to "AAA" if this alignment occurs.  However, the dual rating system penalizes municipal bonds under the pretense that state and local government bonds are riskier investments compared to corporate debt.

79.    According to Municipal Market Advisors, a respected independent strategy and consulting firm in the insurance industry, corporate bonds with "AAA" ratings, the highest available, have defaulted at *ten times* the rate of municipal bonds rated "A", a much lower grade.

80.    The Credit Rating Agencies, in their own reports, have long acknowledged the serious problems directly caused by the dual rating system that they created.

81.    As early as August of 1999, Moody's issued a report stating, "[s]eparate rating systems with different implied expected loss levels may increasingly lead to suboptimal investment decisions in the future by market participants investing in multiple asset classes, and the risks of rating and regulatory arbitrage are rising."

82.    In 1999, Fitch issued a report that acknowledged that many common public bonds - general obligation, tax backed, water/sewer, transportation and education bonds - have "extremely low default rates."

83.    In a March 2000 report, Fitch again acknowledged this fact, stating that their own studies "strongly suggest that there are several sectors of state and local government debt that are underrated compared to . . . corporate debt" and that "many ratings in traditional general obligation and essential government enterprise sectors, such as water and sewer utilities, are too low."  That study went on to say that ". . . the debt ratings on traditional governmental units and enterprises **understate their inherent safety**, which is Fitch['s] contention after its default study."

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

84.     For example, a 2001 S&P research report acknowledged that "[m]any sectors of public finance - particularly the general obligation, appropriation ... and certain vital service sectors (like utilities, water, and waste) - evidence relatively **more stability** and **lower default risk** than the corporate sector for a given rating category ..."

85.     In October of 2001, an S&P employee briefed S&P's Analytics Policy Board on studies undertaken by S&P showing once more that public sector debt default rates were significantly lower than corporate debt default rates. At the briefing, the S&P employee indicated that S&P needed "to either raise [public bond] ratings or to explain ratings inconsistencies." None of this was done.

86.     In a 2002 "highlight" report, Moody's reported that for "the period covering 1970-2000, the one year issuer-weighted average default rate for all Moody's rated municipal issuers - regardless of their rating level - is just .01% versus 1.30% for all corporate issuers." In other words, Moody's own study found that public bonds were on average **130 times** less likely to default than corporate bonds during the first year after issuance.

87.     In March of 2003, Fitch's Credit Policy Board ("CPB"), the body within Fitch that considers and makes decisions on its ratings methodologies and procedures, stated that "the default risk on a US municipal bond was lower than on a US corporate bond." The CPB considered issuing a public statement acknowledging that "there in fact does seem to be an inequality of risk in similarly rated corporate and municipal bonds." The CPB never did.

88.     In an April 2004 S&P report, it concluded that, "[t]he performance of the sector suggests that public finance issuers have largely outperformed other areas in terms of credit strength. Moreover, Standards & poor's expects these differences to persist and will continue to be evidenced by **relative ratings stability** and **infrequent defaults**."

89.     In an October 2005 internal report, S&P's Analytics Policy Board again confirmed that "U.S. public sector entities have historically exhibited substantially lower default rates than corporates, for a given ratings."

90.     Studies by the Credit Rating Agencies themselves show that municipal bonds are much less likely to default than corporate bonds.

91.     For example, municipal bonds rated Baa by Moody's have experienced a default rate of 0.13 percent compared to a 0.52 percent default rate for corporate bonds that are rated Aaa.  In other words, higher rated corporate bonds are **four times more likely to default** than lower rated municipal bonds.

92.     Corporate bonds rated AAA by S&P have defaulted at **twice** the rate of lower rated BBB municipal bonds.  S&P's historical rate of default of A-rated municipal bonds is .23 percent while the historical rate of default of A-rated corporate bonds is **thirteen times** higher at 2.91 percent.

**B.     Wrongdoing in the Bond Insurance Industry**

93.     Defendant insurers Ambac, MBIA, XL Capital, FGIC, and CIFG conspired to support, maintain and perpetuate the dual rating system to squeeze public entities.  The Insurer Defendants are able to use the dual rating system to charge excess insurance premiums from municipalities.

94.     These premiums are charged even though the Insurer Defendants may be more likely to default than the public entity buying the insurance.  Indeed, the Insurer Defendants are being downgraded because the full extent of their previously undisclosed exposure to subprime and other exotic subprime-related instruments is being revealed to the market.  As discussed below, all of the Insurer Defendants were downgraded as a result of their heavy involvement in the high risk subprime markets.

95.     The Insurer Defendants combined control the bond insurance market in California.  The Insurer Defendants have the market power to conspire and control the premiums and costs that public entities are forced to pay in order to

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1  obtain insurance from the insurer Defendants. As a direct result of the dual rating

2  system, Plaintiff Oakland and other California entities have been required to pay

3  hundreds of millions of dollars for the illusory benefit of insurance from

4  supposedly triple-A rated bond insurance companies.

5  **C.    The Bond Insurance Companies Reap Illegal Profits**

6      96.    Because of the dual rating system, Oakland and other California

7  public entities could only obtain a "AAA" rating by purchasing bond insurance

8  from the insurer Defendants, thereby assigning the "AAA" ratings of those

9  insurers to the municipal bond. The insurers themselves have been rated "AAA"

10  on the corporate scale and in effect transfer the top rating to public entities through

11  the policies they sell. The profits are enormous – public entities with lower ratings

12  paid $2.5 billion in premiums for bond insurance in 2007, according to the *New*

13  *York Times*. Moreover, the insurer Defendants charge the entire bond insurance

14  premium up front. They do not provide refunds when a bond issue is refinanced,

15  even when the bond issue was refinanced precisely because the insurer

16  Defendant's credit rating was downgraded.

17      97.    The California State Treasurer has said that to bring up its ratings to

18  what they should have been in the first place, the State of California alone (not

19  including California cities and municipalities such as Plaintiff Oakland) paid $102

20  million from 2003 to 2007 to buy "AAA" bond insurance on its general obligation

21  bonds, allowing the state to sell the bonds at a lower interest rate. It would have

22  been unnecessary to spend the $102 million if the bonds had been rated by the

23  same criteria as non-municipal debt and there was a competitive market.

24      98.    "Municipal issuers buy insurance on their bonds to obtain a triple-A

25  rating that, in many cases, *they already deserve*," Bill Lockyer told the House

26  Financial Services Committee. He went on to state that, "[i]f the state of

27  California received the triple-A rating it deserved, we could reduce taxpayer's

28  borrowing costs hundreds of millions of dollars."

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1      99.   If California's general obligation bonds received the triple-A rating

2   they deserved, California taxpayers and the State's general fund could save

3   anywhere up to **$5 billion in interest rates over the 30-year life of the bonds.**

4      100.   According to an analyst at Municipal Market Advisors, U.S.

5   taxpayers may pay as much as **$3.6 billion extra** on bonds sold in 2006 because of

6   the different rating standards between municipalities and corporations.

7   Bloomberg.com, March 2008.

8   **D.   Conspiracy in the Bond Insurance Industry**

9      101.   The insurer Defendants **pay annual fees** to the Credit Rating

10  Agencies for the right to obtain ratings. The insurer Defendants and the Credit

11  Rating Agencies also do significant business together. Through their interlocking

12  business relationships with the Credit Rating Agencies and the fees they pay to the

13  Credit Rating Agencies, the insurer Defendants act to perpetuate and prop up the

14  unfair dual rating system that underpins the entire bond insurance market.

15  According to agreements between the insurer Defendants and the Credit Rating

16  Agencies, the fees paid to the Credit Rating Agencies **increase** as the insurance

17  portfolios **increase** for the bond insurance companies. In addition, issuers of

18  securities are required to pay any additional fees assessed by the Credit Rating

19  Agencies for them to provide a special rating for an "insured offering", *i.e.* issuers

20  may be forced to pay the Credit Rating Agency to give them a new "AAA" rating

21  **after** they have already paid the insurer Defendants for the bond insurance.

22     102.   According to the Connecticut Attorney General, the insurer

23  Defendants have used their complete market power to maintain the dual rating

24  system. In order to maintain their business model and reap hundreds of millions of

25  dollars in profits, bond insurers colluded to pressure Credit Rating Agencies to

26  maintain the dual rating system. They did so in restraint of trade, acts that have

27  caused great harm to Plaintiff Oakland and other California public entities. If not

28  for the subprime explosion that laid bare the fundamentally unfair nature of the

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                          26

1 bond insurance industry, the scheme of the Defendants would have likely
2 continued. The Defendants' anti-competitive conspiracy not only perpetuated and
3 maintained the dual rating system, it also permitted the insurer Defendants to
4 charge excessively high insurance premiums in order to receive the illusory
5 benefit of a "AAA" rating.

6    103.   For example, in early 2006, Moody's considered abandoning its dual
7 rating system and instead rate municipal bonds under the same scale it uses for
8 corporate bonds. Moody's prepared a request for comments on this proposed
9 change, which asked "should Moody's . . . assign corporate equivalent ratings to
10 U.S. municipal obligations in all sectors . . ." The proposal was sent to prominent
11 bond insurers, including the insurer Defendants. This proposal, however, was **not**
12 **sent** to any public bond issuer or other market participant, such as Plaintiff
13 Oakland or other California public entities.

14    104.   The insurer Defendants knew that their entire business model would
15 be seriously harmed if Moody's decided to properly rate public bonds on the same
16 scale as corporate bonds. One bond insurer wrote, "[d]id we know this was
17 coming - at first blush this looks pretty serious to me . . . won't higher ratings just
18 serve to contract spreads. This is **cutting at the heart of our industry** given that
19 investors buy on rating. While we in the industry **might agree with the**
20 **default/loss conclusion** (this is in part the basis of our success and ability to
21 leverage as high as we are), to lay it out there like this could be very detrimental."
22 An executive at the same bond insurer agreed, "...we know that hardly anybody
23 reads the Moody's special reports so it didn't matter. However, if they actually
24 assign the higher ratings, that's a totally different story..."

25    105.   It is clear that the Defendant bond insurance companies were fully
26 aware of the impact of the dual rating system and its central importance to the
27 functioning of their business. As the bond insurance companies acknowledge, this
28 discriminatory rating system is at the "heart of the bond insurance industry." The

1  fact that Moody's was suggesting such a change was never disclosed by the
2  Defendants to Plaintiff Oakland or to the marketplace. The fact that the
3  Defendants always knew that the system was discriminatory (even agreeing with
4  the Credit Rating Agencies that the system was discriminatory) was also never
5  disclosed to Plaintiff Oakland or to the marketplace. As the Connecticut Attorney
6  General has alleged in his complaints against the Credit Rating Agencies, no one
7  ever disclosed to Plaintiff Oakland or to the market that they internally recognized
8  and believed they were obtaining large and unlawful profits due to an inherently
9  flawed rating system. The Defendants also never disclosed to Plaintiff Oakland or
10 the market that they knew that the "fine print" explanations regarding the
11 difference between municipal bonds and corporate bonds was not fully understood
12 or appropriately priced in the bond market.

13      106.  To prevent Moody's from abandoning its dual rating system, several
14 bond insurers, including the insurer Defendants, conspired to organize a
15 coordinated response to Moody's request for comments. They did so through the
16 bond insurers' industry association, the Association of Financial Guarantee
17 Insurers ("AFGI"). One bond insurance executive wrote, "I have contacted AFGI
18 to see if we can draft an industry response . . . I think this is important to all,
19 particularly if the wider applicability of this mapping leads to contracted spreads
20 in the muni markets."

21      107.  In May of 2006, top executives from two of the bond insurers met
22 with Moody's top public finance analysts. At that meeting, the bond insurance
23 executives expressed the bond insurance industry's concerns about Moody's
24 proposal to assign credit ratings to municipal bonds using the same ratings scale as
25 for corporate bonds. After the meeting, one bond insurance executive wrote,
26 "Mtg. went well . . . **we were preaching to choir**."

27      108.  As a result of the illegal and unlawful pressure of the insurer
28 Defendants, in June of 2006, Moody's publicly released a modified version of its

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1    requests for comments. The public version of Moody's request for comments

2    dropped any reference to assign "corporate equivalent ratings to U.S. municipal

3    obligations in all sectors" – as had been suggested by the original request for

4    comments that had been secretly provided to the insurer Defendants but not any

5    bond issuer, such as Plaintiff Oakland. Instead, the public request for comments

6    issued in June 2006 only sought comments on whether corporate equivalent

7    ratings should be offered on *taxable* public bonds sold in the United States.

8    Taxable public bonds make up a minuscule portion of the entire public bond

9    market, greatly narrowing the original, non-public proposal. The public request

10    for comments also raised the possibility of entirely eliminating the assignment of

11    corporate equivalent ratings altogether. Moody's made these changes in its public

12    requests for comments because of pressure from the insurer Defendants.

13         109. U.S. Rep. Michael E. Capuano, a member of the House Committee on

14    Financial Services, described municipal bond insurance as "legal extortion" of

15    cities and states, and said insurance issuers have "stolen billions, if not trillions, of

16    taxpayers dollars from their pockets."

17  **E.**    **The Defendants Failed to Disclose Their True Financial Condition and**

18        **Risk Exposure to Plaintiff**

19         110. The insurer Defendants have further harmed Plaintiff Oakland and

20    other California public entities and have engaged in unlawful and illegal acts by

21    failing to disclose to the Plaintiff the extent of their exposure to the subprime

22    industry. As the insurers of Oakland's municipal bonds, the insurer Defendants

23    had a duty not to act recklessly and jeopardize their ability to comply with their

24    insurer obligations. If they had fully disclosed their risky and uncertain financial

25    condition, Plaintiff would not have purchased bond insurance from one or more of

26    the insurer Defendants. In the current declining market, Oakland and California

27    public entities have found that the bond insurance they have purchased is close to

28    worthless.

111. A substantial factor in causing the losses suffered by the Plaintiff is the fact that the insurer Defendants have lost their "AAA" corporate standard bond rating and interest rates are rising. Indeed, the insurer Defendants, such as MBIA and Ambac need the fees and costs from municipal bond insurance in order to be able to shore up their own financial conditions. The insurer Defendants' credit ratings and their financial viability have been seriously damaged due to the recent subprime crisis and the losses suffered on mortgage-backed securities.

112. The Defendant insurers earned record profit margins from insuring safe municipal bonds. Between 2002 and 2007, MBIA's average profit margin was 39 percent while Ambac's average profit margin was 48 percent. However, it was not enough. In pursuit of even greater profits, the Defendant insurers dove into the CDO business, insuring **hundreds of billions of dollars** of CDOs backed by subprime loans, seriously jeopardizing their core business: insuring and protecting safe municipal bonds.

113. According to a principal at Capital Markets Management LLC, "It (CDOs) looked so profitable and so easy that they let the portfolio shift too far toward structured finance." He described CDOs as follows:"It morphed into this monster that is devouring them."

114. H. Russell Fraser, one of the founders of bond insurer ACA Financial Guaranty Corp. ("ACA") objected to ACA's decision to heavily enter the CDO market. According to Mr. Fraser, he left the company due to a dispute over the riskiness of ACA's decision to enter into the CDO market. Mr. Fraser stated, "I knew that if they played with fire long enough, they were going to get burned."

115. The insurer Defendants insured hundreds of billions of dollars worth of high risk CDOs (essentially packaged subprime loans). By packaging these products, financial institutions were able to transform extremely high-risk subprime paper into illusory "AAA" paper. Oftentimes the largest holding of some CDOs was even more CDOs. For example, Ambac insured $1.9 billion of a

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT

30

1  CDO called Ridgeway Court Funding II Ltd. whose holdings included Carina

2  CDO Ltd., a CDO that was being liquidated in January of 2008. Ridgeway also

3  had exposure to **three other CDOs**, 888 Tactical Fund Ltd., Pinnacle Peak CDO

4  Ltd. and Octonion CDO. Ltd., all of which had exposure to each other and to

5  Carina CDO Ltd. In essence, Ambac's hugely risky $1.9 billion gamble was

6  multiplied tenfold due to the interlocking business relationships of these CDOs.

7  116. The insurer Defendants entered into the CDO markets out of greed,

8  attracted by the high premiums they could charge while having to set aside very

9  little capital. The Defendant insurers agreed to insure CDOs for billions of dollars

10  even when they knew that **no reliable default rate data existed**. What the

11  Defendant insurers were doing was putting at risk their municipal clients, such as

12  Oakland, by backing hundreds of billions of dollars of high risk loans (without any

13  dependable default rate data) and failing to disclose that exposure. A managing

14  director at New York-based research firm Graham Fisher & Co. was quoted as

15  stating, "They lost their way out of greed." Bloomberg Markets, March 2008.

16  117. In the past, a managing partner at Pershing Square Capital

17  Management LP challenged the insurer Defendants' business, stating that he

18  believed that the Defendant insurers had larger mark-to-market losses on CDOs

19  than it was disclosing, was underreserving against possible losses and didn't

20  deserve its AAA rating. MBIA's CEO responded firmly, stating that "We stand

21  firmly by the soundness of our book of business and the quality of our

22  underwriting."

23  118. By chasing the higher profits of CDOs while underestimating the

24  risks, the bond insurers jeopardized their basic business: insuring municipalities

25  against default.

26  119. Beginning at the end of 2007, Defendant Ambac began to

27  acknowledge serious deterioration in its CDO portfolio and indicated it had more

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                31

exposure to anticipated losses and defaults related to its CDO contracts than previously disclosed.

120. On October 24, 2007, Ambac issued a press release entitled, "Ambac Financial Group, Inc. Announces Third Quarter Net Loss of ($360.6) Million; Included Previously Announced $743 Million Unrealized Mark-to-market Loss on Credit Derivative Portfolio; Third Quarter Net Loss Per Diluted Share of ($3.51); Third Quarter Credit Enhancement Production $31.1 million, up 99%."

121. In December of 2007, MBIA announced that it had $8.1 billion in exposure to complex and risky securities backed by home loans.

122. In January of 2008, Fitch downgraded Ambac from "AAA" status to "AA" status.

123. That same month, Fitch said that it was downgrading Security Capital Assurance, the parent company of Defendant XL Capital, because of its expected losses on structured finance collateralized debt obligations ("CDO") backed by subprime residential mortgage backed securities ("RMBS").

124. Moody's and S&P have both placed Ambac and MBIA on negative outlook and are seriously reviewing the financial conditions of both companies. Both Moody's and S&P are considering further downgrades of the credit rating of Ambac and MBIA.

125. In February of 2008, MBIA announced $2.3 billion in losses for the fourth quarter of 2007 on $3.5 billion of write-downs in its insured credit derivatives portfolio.

126. In March of 2008, Security Capital, the parent of Defendant XL Capital, was downgraded to junk status by Fitch, citing serious capital concerns related to the subprime crisis. At the end of last year, Security Capital was one of seven bond insurers with the highest AAA rating. This collapse has caused monetary harm to the public entities that had bought bond insurance from the insurer Defendants.

127.  In April of 2008, Fitch downgraded MBIA from "AAA" status to "AA" status.

128.  In May of 2008, Defendant MBIA reported a net loss of $2.4 billion, reflecting a $3.6 billion unrealized mark-to-market fall in value on the credit default swaps used by MBIA to insure structured finance credits. MBIA has also announced it is contributing $900 million to its financial guaranty subsidiary.

129.  On May 20, 2008, Moody's announced it was downgrading CIFG to "Ba2", which is below investment grade. Moody's announced it was downgrading CIFG because it believed that CIFG would fail to meet minimum regulatory capital requirements due to losses suffered from CDOs.

130.  In May of 2008, Defendant FGIC reported that it had lost an additional $33.4 million in the first quarter of 2008 in covering its book of CDO's. FGIC reported that $279.2 million was set aside to cover losses on CDOs of mortgages written from 2005 through 2007. A year ago, Defendant FGIC had reported earnings of $68.5 million and was still rated "AAA" by all three Credit Rating Agencies. In May of 2008, Defendant FGIC was rated Baa3 by Moody's, BB by S&P and BBB by Fitch.

131.  On May 28, 2008, Defendant Ambac announced it was writing down an additional $228 million in mark-to-market adjustments on CDO's of asset-backed securities. These losses, similar to the losses suffered by all of the Defendant bond insurance companies, were not appropriately disclosed to the Plaintiff.

132.  On June 4, 2008, Moody's announced it was reviewing the financial conditions of Defendants Ambac and MBIA and was seriously considering downgrading both companies because of the magnitude of their losses from insuring risky subprime-related instruments in comparison to their assets. Moody's indicated it had serious questions regarding the ability of Defendants Ambac and MBIA to fulfill their financial obligations as bond insurers.

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

133.   The next day, on June 5, 2008, S&P announced it was downgrading both Defendants Ambac and MBIA to "AA" from "AAA", citing financial weakness and loss of business.  Prior to the recent credit rating downgrades, Ambac and MBIA were the two largest monoline insurers in the United States.

134.   Four days later, on June 9, 2008, S&P announced it was downgrading Defendant XL Capital further into junk bond status, rating it "BBB-" and on negative credit watch.  That same day, S&P downgraded Defendant CIFG to "A-" and placed Defendant FGIC's "BB" rating on CreditWatch with negative implications.

135.   On June 19, 2008, Defendants Ambac and MBIA, the two largest bond insurance companies in the State of California, both lost their last triple A rating when Moody's downgraded both companies.  Defendant Ambac was downgraded from Aaa to Aa3 with a negative outlook while Defendant MBIA was downgraded to A2.

136.   The next day, Moody's announced that it was downgrading Defendant FGIC from Baa3 to B1.  Moody's also downgraded FGIC's parent, FGIC Corporation from B3 to Caa2.  That same day, Moody's also downgraded Defendant XL Capital to B2 with a negative outlook from A3.  Moody's also downgraded Defendant XL Capital's parent company, Security Capital Assurance to Ca from B3.  This downgrade lowered both Defendant FGIC and XL Capital's credit ratings to junk status.

137.   On July 21, 2008, Moody's announced it was placing two additional "AAA" rated bond insurance companies, Financial Security Assurance, Inc. ("FSA") and Assured Guaranty Corporation ("AGC") on negative review for potential downgrade.  In its report regarding AGC, Moody's wrote that a AAA-rating for AGC "may no longer be consistent with its current ratings given uncertainty about the firm's portfolio risk profile, material shifts in the demand function for financial guarantees, and as observed recently among Assured's

1   competitors--potential sensitivity of its franchise and financial flexibility if losses

2   continue to rise."

3       138.   In its report, Moody's also cited serious concerns about FSA's

4   residential mortgage-backed securities, suggesting that "material losses" from

5   those residential mortgage-backed securities could affect FSA's credit.

6       139.   On July 29, 2008, Moody's placed the 'Baa1' senior debt rating of

7   Defendant XL Capital and the 'A1' IFS ratings of XL's insurance operating

8   subsidiaries on review for possible downgrade.

9       140.   That same day, Fitch downgraded Defendant XL Capital's credit

10  rating to CCC from BB, further reducing Defendant XL Capital into junk status.

11      141.   On July 30, 2008, Fitch announced it had downgraded Security

12  Capital Assurance's long term issuer rating to CCC- from B-, significantly deeper

13  into junk status. That same day, Fitch lowered the insurer financial strength

14  ratings for Defendant XL Capital's subsidiaries to CCC from BB. Fitch also

15  stated that if regulatory intervention were to occur because of the losses, it could

16  lower the ratings for Defendant XL Capital and its parent and subsidiaries to

17  default status.

18      142.   On July 31, 2008, Fitch also downgraded FGIC's credit rating from

19  BB to CCC-. Fitch stated that this action was undertaken due to Fitch's

20  expectation that FGIC will experience further credit deterioration on its book of

21  business backed by residential mortgage-backed securities (RMBS). Fitch stated

22  their belief that this deterioration could lead to further additions in loss reserves

23  which will increase the possibility that FGIC could become subjected to some

24  form of regulatory intervention.

25      143.   On August 6, 2008, S&P placed FSA on negative outlook pending

26  review. In their report, S&P stated that absent a major capital contribution, "we

27  believe that FSA's capital adequacy margin of safety would have fallen modestly

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1   below 'AAA' rating standards as a result of deterioration and projected losses in

2   FSA's insured residential mortgage-based securities portfolio and for its financial

3   product line."

4        144.   Richard Larkin, research director at brokerage Herbert J. Simons &

5   Co. in Iselin, New Jersey and the former chief municipal rating officer at S&P,

6   described this as "a watershed moment in the municipal bond industry."  Mr.

7   Larkin further stated that, "[t]he bond insurers have lost a tremendous amount of

8   credibility."  Bloomberg.com,  March 2008.

9        145.   A principal of Pershing Square Capital stated, "What's significant

10   about ACA is that it's the first monoline to blow up. There's nothing materially

11   different about Ambac, FGIC, MBIA or XL Capital. They all have the same

12   problem, that they are highly leveraged, have risky exposures and inadequate

13   reserves."

14        146.   The Defendant insurers have reaped hundreds of millions of dollars in

15   fees from California public entities and cannot now provide the "service" that they

16   claimed that they were providing.  Indeed, the only reason Plaintiff Oakland was

17   forced to pay for this "service" was due to the dual rating system.

18        147.   The current situation in the financial markets demonstrates that the

19   Defendants' scheme has forced the more responsible party (public entities) to pay

20   the less responsible party (bond insurance companies) hundreds of millions to

21   acquire a guarantee from the less responsible party.  This is akin to paying the

22   fiscally irresponsible younger brother to insure the debt of the responsible older

23   brother.

24        148.   Mr. Fraser, the founder of ACA stated that, "[t]here's no reason for an

25   AAA-rated bond insurer to be doing anything with subprime mortgages."  He

26   continued by stating, "It's going to hurt their business because municipalities are

27   going to ask, 'Is this insurance really worth it?'"  With the full extent of the

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1  subprime debacle still being uncovered, the answer is increasingly appearing to be

2  "No."

3  149.  For example, Califomia's costs on $100 million of bonds that were

4  issued in 2002 and insured by Security Capital *increased*. The annualized rate on

5  these bonds went up to 6.22 percent on February 20, 2008 because these bonds

6  were guaranteed by Security Capital, which was downgraded.  A year earlier, the

7  annualized rate on these bonds was 3.55 percent.

8  150.  The injuries caused by the mortgage defaults have spread throughout

9  the financial system.  Municipal bond insurers have lost their triple-A rating or are

10  in serious danger of losing their triple-A rating.  Investment funds, such as money

11  market funds and hedge funds are forced to unload municipal bond debt because

12  of both internal rules and, more importantly, Securities and Exchange Commission

13  rules, that forbid them from investing in debt that has not achieved a certain bond

14  rating.

15  151.  If municipal securities had been properly rated, California public

16  entities would not have been forced to pay high insurance premiums and endure

17  higher borrowing costs that are a direct result of their supposed "insurer" losing

18  their triple-A bond rating.  In addition, California public entities, including

19  Plaintiff Oakland, would not have had to pay additional refinancing costs if the

20  insurer Defendants had not improperly invested heavily in CDOs.

21  152.  In their agreements with Plaintiff Oakland, the insurer Defendants

22  stated that they were "AAA"-rated entities.  Indeed, if not for this promise,

23  Oakland's bonds would not have been upgraded to triple-A.  Oakland paid the

24  premiums with the expectation that it was buying insurance from a triple-A rated

25  entity.  However, the insurer Defendants failed to disclose to Plaintiff Oakland,

26  and other corporate entities, the true extent of their exposure to the subprime CDO

27  market.  Even the Defendants' initial acknowledgments of financial problems tried

28  to downplay the problem.  Today, the exposure of the Defendants to subprime

1   instruments is large enough to cause serious stress to the ability of the Defendants

2   to support their insurance obligations.

3        153.   In addition, the insurer Defendants also issued financial statements

4   that were misleading.  In those financial statements, the insurer Defendants

5   reiterated the strength of their financial condition and the fact that they were

6   "AAA" rated entities.  However, these statements were false and misleading

7   because the insurer Defendants failed to state that their record profits were being

8   obtained only by insuring hundreds of billions of dollars of high risk subprime

9   instruments.

10       154.   Barney Frank, the chairman of the House Financial Services

11  Committee has stated that the bond insurers, including the Defendants, erred when

12  they insured speculative structure-finance products after backing safe municipal

13  bond deals.  "They insured a safe product and then took that money and speculated

14  in ways that they endangered the cities and town that they were insuring."  Barney

15  Frank went on to state, "[t]his is the private sector having facilitated harm."

16  **F.    Auction-Rate Bonds Have Been the Hardest Hit by the Deception**

17       155.   Auction-rate bonds have been hit the hardest and those public entities

18  that have issued auction-rate bonds have been amongst the biggest victims of the

19  improper acts and omissions of the Defendants.  As of the end of 2006, the

20  auction-rate securities market had grown to $350 billion.

21       **1.    Plaintiff City of Oakland Issued Auction-Rate Bonds**

22       156.   The City of Oakland issued auction-rate bonds, one of which was

23  insured by XL Capital Assurance, Inc.  Conceptually, XL Capital's triple-A rating

24  was intended to reduce interest rates for the City of Oakland.  In that auction-rate

25  bond offering, the City of Oakland did not receive a "AAA" rating until after it

26  had acquired bond insurance from Defendant XL Capital.

27       157.   Moody's Investor Service wrote that it "has assigned the rating of

28  AAA . . . based upon an insurance policy provided by XL Capital Assurance."

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Standard's & Poor changed the rating of the City of Oakland's bond issuance to "AAA" from "A+". "The rating reflects our assessment of the likelihood of repayment of principal and interest based on the bond insurance policy [XL Capital Assurance Inc.] is providing." Fitch assigned a rating of 'AAA' to the municipal bonds issued by the City of Oakland. "This reflects credit enhancement in the form of a bond insurance policy provided by XL Capital Assurance Inc. which has an insurer financial strength rating of 'AAA.'"

158.   As a result of the dual rating system, the City of Oakland was required to pay an unnecessary premium for the acquisition of municipal bond insurance from XL Capital Assurance Inc.

159.   On March 28, 2008, Fitch downgraded XL Capital Assurance Inc. to a "BB" rating. As a result, the City of Oakland's interest payments and borrowing costs rose dramatically, causing harm to the City of Oakland and its taxpayers. Shortly thereafter, Fitch similarly downgraded its rating of the City of Oakland's auction rate securities that had been insured by Defendant XL Capital.

160.   After XL Capital's credit rating collapsed below Oakland's artificially low "A" rating, Oakland's interest rates rose. As a result of XL Capital's downgrade, the City of Oakland has been paying 12% interest on their auction-rate bonds and has been forced to spend additional money to refinance those bonds. Oakland had paid insurance premiums for insurance from an insurance entity that was significantly less financially sound than itself and now has been damaged.

2.   **Auction-Bond Failures Caused by Bond Insurer Downgrades**

161.   The interest rate on an auction-rate municipal bond resets every few days, for example, 7, 28 or 35 days, depending on the particular characteristics of the bond. The municipal bonds are then sold in a "Dutch auction", as previously described above. The interest rate is thus dependent on the number of investors that want to purchase the municipal bond. The idea is that if a bond is highly

1 sought after, it will have a lower interest rate then a fixed-rate municipal bond.

2 The flip side, however, is that if no investors are interested, interest rates can reach

3 astronomical levels in order to entice investors.

4    162.   When there are no buyers, this is referred to as a "failed auction." In

5 the situation of a "failed auction", the bond documents dictate the interest rate to

6 be paid on the bond. The interest rate can be in the double digits. But for the acts

7 and omissions of the Defendants, the auctions would not have failed. According

8 to a February 2008 article in the *New York Times*, over 500 auctions failed during

9 the first two weeks of February.

10    163.   Due to the dual bond rating system, auction-rate municipal bonds that

11 should have been rated "AAA" are being unfairly treated as below "AAA."

12 Investment funds that might want to invest are banned from doing so and other

13 investors do not fairly value the true default risk of these municipal bonds. As

14 such, the investor pool shrinks. When the insurer Defendants' financial condition

15 began to deteriorate as a direct result of their exposure to subprime, they were

16 downgraded by the Credit Rating Agencies and investors began to withdraw from

17 these auction-rate municipal bonds. The auction rate municipal bonds themselves

18 were downgraded. The problems with the insurer Defendants led to investors

19 either not wanting or not being able to buy the auction rate municipal bonds.

20 Therefore, the auctions failed and, as a result, municipal entities were forced to

21 endure sometimes double digit interest rates.

22    164.   The Defendant insurers have caused great harm to public entities by

23 both receiving high premiums to insure the municipal bonds of public entities

24 while simultaneously insuring risky mortgage-backed securities backed by

25 subprime loans. By doing so, the bond insurers carelessly risked the triple-A

26 rating that is, in essence, the sole product they are selling to public entities.

27    165.   Numerous public entities have been victims. In one case, a municipal

28 bond that was meant to build hospitals was guaranteed by MBIA. Prior to

1  February 19, 2008, the interest rate on that municipal bond had been 4.25 percent.

2  However, with the threat of a ratings downgrade on MBIA, the auction failed,

3  leading to an interest rate of 15 percent. *New York Times*, February 2008.

4    166.   Another public entity has found itself paying a 20 percent interest rate

5  on failed auctions. At the top of the list of worries of prospective investors is the

6  precarious financial conditions of the insurer Defendants, such as Ambac and

7  MBIA. The Defendant insurers never fully disclosed the extent of their exposure

8  to the subprime market. *New York Times*, February 2008.

9    167.   In a February 8, 2008 report, Alex Roever, a JP Morgan Chase & Co.

10  fixed income analyst wrote that $6 billion of auction debt failed on investor

11  concerns that bond insurers would lose their "AAA" rating.

12    168.   In May of 2008, the Dormitory Authority of the State of New York

13  ("DASNY") announced that it was converting or refunding up to $1.55 billion of

14  auction rate bonds. As part of that refinancing, DASNY also announced $1.09

15  billion of new bonds with preliminary approval for an additional $111.5 million of

16  new tax-exempt bonds. DASNY documents indicate that the rating downgrades

17  for several bond insurers adversely affected the marketability of the auction rate

18  bonds.

19    169.   Similarly, the Massachusetts Water Resources Authority ("WRA")

20  announced it would sell $1.6 billion of revenue refunding debt to help it exit the

21  auction-rate market. Auctions failed because of the rating downgrades of

22  Defendant bond insurers Ambac and FGIC. According to the Massachusetts

23  WRA, $2.6 million of additional costs is due directly to the rating downgrades of

24  Defendant bond insurers Ambac and FGIC.

25    170.   The extent of the insurer Defendants' exposure to the subprime loan

26  industry, which caused the auction failures, was never fully disclosed to the

27  Plaintiff Oakland and other California public entities who purchased insurance

28  from the insurer Defendants.

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                    41

171. Plaintiff Oakland issued auction-rate securities that suffered from high interest rates due to the auction failures. Those high interest rates have harmed Plaintiff Oakland and Oakland taxpayers. Those auction failures are a result of the wrongdoing of the Defendant insurers, all of whom are in serious jeopardy of being unable to fulfill their obligations as insurers to Plaintiff Oakland and other California public entities.

## VIII.

## CREDIT RATING AGENCIES ADMIT THE FLAWED NATURE OF THE DUAL RATING SYSTEM

172. In a press release, Treasurer Bill Lockyer stated, "Our message to the agencies is simple. *Treat taxpayers the same as corporations.* Don't make them pay more to finance schools and roads than corporate entities pay when they bundle bonds into fancy, opaque investment vehicles. Rate municipal bonds based on the risk of default. End the double standard and create a unified, global rating approach that treats all issuers equally, and better serves taxpayers and investors."

173. On March 4, 2008 the California Treasurer and government officials from Oregon, Connecticut and thirteen other states and cities wrote to Fitch, Moody's and S&P to urge them to end the unfair dual standard in rating government bonds. Due to the pressure from government officials such as the California Treasurer, Moody's and Fitch have finally agreed to take some steps to rationalize their rating systems. The resulting scandal has led the Credit Rating Agencies to reevaluate the unfair dual rating system that has long been perpetuated by the Defendants.

174. Fitch assigned Group Managing Director Robert Grossman to "harmonize" the ratings for corporate and public finance ratings.

175. As a result, Fitch, on March 19, 2008, stated, "As we developed our capital model, it was our belief that other models currently used in the market *overstated the risk of many US municipal exposures* insured by the financial

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT

42

guarantors and understated the risk of many structured finance exposures. We believe this to be evident when reviewing historical default studies that show the default rate on US municipal debt is a fraction of that on corporate debt, whereas the default rate on structured finance debt is equal to, if not moving higher than, that of corporate debt. Thus, a key goal in developing a new model was to address this perceived imbalance found in existing models." On July 31, 2008, Fitch issued its "Exposure Draft: Reassessment of Municipal Ratings Framework." In this report, Fitch proposed "a recalibration of its municipal rating scale for corporate, sovereign, and other entities." Fitch reported that after it completes its recalibration, **86% of state and local general obligation bonds will receive a rating of AA or higher**.

176. Moody's first stated in May of 2008 that it would provide global scale ratings, their term for the corporate standard bond rating, to municipal issuers, at the request of issuers. Moody's also stated that it would simplify the conversion table it uses to estimate global ratings for bonds. This should have been done much earlier so that investors could compare municipal bonds and corporate bonds on a true "apple-to-apple" basis.

177. On June 12, 2008, Moody's reversed course, proposing to alter the rating system for municipal bonds to be in line with its global rating scale for corporations. Gail Sussman, managing director for public finance at the New York-based company, said the change will eventually lead to upgrades of some of its 78,000 municipal ratings. This proposal is an admission that the original dual rating system was flawed, forcing California municipalities to spend hundreds of millions of dollars unnecessarily on bond insurance. Bloomberg.com, June 2008.

178. Recently, S&P has announced that it is appointing an ombudsman to "study" whether there are any "conflicts of interest" in the way it develops ratings. Furthermore, an external firm is being hired to review S&P's ratings to check if

1  the agency has handled conflicts of interest properly and maintained
2  independence.

3      179.   S&P has now upgraded more than 5,000 municipal bonds in order to
4  bring the rating of these municipal bonds more in line with its criteria for rating
5  corporate bonds.  This is also an admission that the dual rating system, which
6  Defendants conspired to pressure the Credit Rating Agencies to maintain, was
7  inherently flawed.

8                                   IX.

9           **INDUSTRY ASSOCIATIONS USED FOR CONSPIRACY**

10     180.   Industry associations in the municipal bond industry proved to be one
11  of the mechanisms through which the unlawful and illegal acts occurred.  During
12  those meetings, discussions and other communications occurred in which the
13  Defendants discussed how to manipulate the system for their benefit.  These
14  conferences served as one of the means in which the wrongdoing against
15  California public entities was perpetuated.

16     181.   There are several trade groups the Defendants belong to at which the
17  Defendants engaged in anti-competitive and unlawful behavior.  One of the largest
18  groups is the Securities Industry and Financial Markets Association (SIFMA).

19     182.   SIFMA is an industry trade group representing securities firms,
20  banks, and asset management companies.  SIFMA was formed on November 1,
21  2006, from the merger of The Bond Market Association and the Securities
22  Industry Association.  SIFMA's mission is to "promote policies and practices that
23  work to expand and perfect markets, foster the development of new products and
24  services, and create efficiencies for member firms, while preserving and enhancing
25  the public's trust and confidence in the markets and the industry."

26     183.   Amongst SIFMA's members are Ambac, MBIA, Fitch, Moody's and
27  Standard & Poor's.  All of the Defendants used these opportunities to conspire and

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                45

1   perpetuate the scheme that has cost California taxpayers billions of dollars in

2   higher interest rates and borrowing costs and in unnecessary fees and costs.

3        184.   The Information Management Network ("IMN") holds Municipal

4   Finance Conferences in California.  At these meetings, municipal bond issuers,

5   municipal bond rating agencies and municipal bond insurance companies meet to

6   discuss and exchange information.  The Defendants use these association meetings

7   and conferences as one of many means, including other forms of communication,

8   to conspire to the detriment of California local and municipal entities.  The IMN

9   California Municipal Finance Conference has been held at the **Ritz Carlton Hotel**

10  **in San Francisco for the last two years.**  Representatives of the Credit Rating

11  Agencies are present at this conference as are senior representatives of the

12  Defendant insurance companies, including Defendant Jason Kissane, the head of

13  MBIA's San Francisco office and MBIA's West Coast operations, Defendant Neil

14  Pack, the current head of CIFG's San Francisco office, as well as Kathleen

15  McDonough, a senior managing director at Defendant Ambac.  At this conference,

16  they discussed the municipal bond insurance industry and how to maintain the

17  bond insurance business by perpetuating the dual rating system.

18       185.   The Bond Buyer holds an Annual California Public Finance

19  Conference in which professionals in the municipal bond industry meet to discuss

20  and exchange information in the municipal bond industry.  The Bond Buyer is a

21  major publication focusing on public financing, including municipal bonds.  The

22  Bond Buyer's Annual California Public Finance Conference is a meeting place for

23  Defendants to exchange information.  It also served as a cover for the Defendants'

24  to perpetuate their wrongdoing.  The 17th Annual California Public Finance

25  Conference was held in Carlsbad, California in 2007.  Both Defendants Jason

26  Kissane and Neil Pack were present at the California Public Finance Conference

27  where the issues alleged in this complaint were discussed.  Representatives from

28  most of the Defendant insurance companies, as well as representatives from the

1  Credit Rating Agencies were all present at the conference and discussed the
2  allegations made above.

3        186.   The Association of Financial Guaranty Insurers (AFGI), formed in
4  1986, is one of the biggest trade associations for bond insurance companies. They
5  are the trade association of the insurers and reinsurers of municipal bonds and
6  asset-backed securities. Amongst their members are the major municipal bond
7  insurance companies, including Ambac and XL Capital.

8                                      X.

9    **CALIFORNIA PUBLIC ENTITIES SUCH AS OAKLAND SUFFERED**
10       **INJURY THROUGH THE CONDUCT OF THE DEFENDANTS**

11       187.   Through their unlawful acts, the Defendants acted to the detriment of
12  Plaintiff Oakland and other California public entities, leading to the Defendant
13  insurers reaping unlawful profits from California public entities. Oakland alone
14  has paid millions in bond insurance premiums to the Defendant insurers during the
15  past few years for bond insurance that is essentially worthless.

16       188.   The Defendants acted to the detriment of Oakland, as well as other
17  California public entities and California citizens. The wrongful acts of the
18  Defendants have served to unlawfully increase the costs of municipalities for
19  issuing bonds while filling the bank accounts of the Defendants.

20       189.   In so doing, the Defendants have committed unlawful acts that
21  allowed them to illegally and improperly obtain California public monies,
22  including the public monies of Plaintiff Oakland.

23       190.   The nature of the Defendants' unlawful acts has caused serious harm
24  to the Plaintiff and other California cities and counties. As a direct result of the
25  conduct of the Defendants, Plaintiff Oakland and other California public entities
26  paid high premiums for worthless bond insurance. All of this has resulted in
27  serious harm to Plaintiff and other California public entities.

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                    47

# XI.

## GOVERNMENT INVESTIGATIONS INTO THE
## DUAL RATING SYSTEM IN THE BOND MARKET

191.   In October 2007, the Connecticut Attorney General's office issued subpoenas to Fitch, Moody's and S&P as part of an overall investigation into the practices of the municipal bond industry. The "investigation seeks to determine whether credit-rating agencies may be exploiting their dominant positions to unfairly raise prices or exclude competitors. Assuming debt ratings are honest and untainted is vital to investors, companies and government." *Wall Street Journal*, October 27, 2007.

192.   In a Form 10-Q filed with the SEC Oct. 26, 2007, McGraw-Hill, the parent of S&P, said: "On October 16, 2007, Standard & Poor's received a subpoena from the Connecticut Attorney General's Office requesting information and documents relating to the conduct of Standard & Poor's credit ratings business." The company said it was responding to the subpoena.

193.   Moody's disclosed in its 10-Q filed with the SEC on November 2, 2007, that it "has received subpoenas and inquiries from states attorneys general and governmental authorities and is cooperating with those inquiries." No other details were released.

194.   The *Wall Street Journal* article quoted Fitch spokesman Jim Cockle as saying Fitch had been contacted by AG's and other regulators. "A lot of regulatory authorities and interested parties are in the process of investigating the ratings agencies, and we are cooperating with all of them," he said.

195.   The Connecticut Attorney General testified before the House Committee on Financial services on March 12, 2008, focusing on the rating system for municipal bonds. He said the current dual system of rating bonds issued by public entities "is dangerously misleading and misguided. It imposes a secret Wall Street tax on states, cities and school district across this nation." He also

1 said the investigation he launched in October "is still ongoing and active" and

2 "focuses on how this unfair system was started and perpetuated, who profits from

3 it, and what anticompetitive effects it has on the prices that states and

4 municipalities pay to borrow for essential projects like schools and roads."

5     196.   The Attorney General charged that the "misuse of market power and

6 restraint of competition" by the municipal bond rating agencies "is plainly

7 anticompetitive and anti-taxpayer, causing direct harm to municipal and state

8 customers issuing bonds."

9     197.   On January 23, 2008, Massachusetts securities regulators subpoenaed

10 documents from Defendants **Ambac** and **MBIA** in order to determine if the

11 insurers informed Massachusetts communities that were trying to raise money

12 about the insurers' own exposure to collateralized debt obligations.

13     198.   Massachusetts' Secretary of the Commonwealth questioned whether

14 Massachusetts cities and towns would have relied on Defendants Ambac and

15 MBIA for financial guarantees to ensure bond investors are repaid if the

16 governments had known about the firms' guarantees of CDOs. The failure of

17 MBIA and Ambac to fully disclose their exposure to CDOs was both illegal and

18 improper.

19     199.   In May of 2008, SEC Chairman Christopher Cox announced that the

20 SEC was considering proposing new rules for Nationally Recognized Statistical

21 Rating Organizations ("NRSRO"). The purpose of these new rules are to: enhance

22 investor understanding of the important differences between ratings for municipal,

23 corporate and structured debt instruments; regulate and limit conflicts of interest,

24 reduce regulatory reliance on ratings and disclose the role of third party due

25 diligence in assigning ratings.

26     200.   In June of 2008, all three of the Credit Rating Agencies entered into

27 settlement agreements with the New York Attorney General in which all three

28 have agreed to change their way of doing business. Most importantly, they have

1 been forced to resolve their involvement in the subprime market meltdown and
2 avoid the conflicts of interest that affected their ratings of securities.

3     201. Also, in June of 2008, the SEC announced new rules regulating all
4 NRSROs which would also lead to significantly greater transparency on the part of
5 the Credit Rating Agencies regarding their rating methodology, greater clarity on
6 how to interpret and understand their ratings, and also regulating the conflicts of
7 interests that have tainted the ratings given by the Credit Rating Agencies.

8     202. On July 31, 2008, Connecticut AG Richard Blumenthal filed three
9 lawsuits in Connecticut state court against all three of the Credit Rating Agencies
10 as a result of the flawed dual credit rating system. In those complaints, the
11 Connecticut Attorney General details how all three of the Credit Rating Agencies
12 knew (since at least 1999) knew that their rating system for municipal bonds was
13 flawed and the impact that flawed rating system had on public entities. Those
14 allegations show both the tremendously flawed nature of the dual rating system
15 and how this has caused significant harm to California public entities, such as
16 Plaintiff Oakland.

**XII.**

**FRAUDULENT CONCEALMENT**

19     203. Throughout the relevant period, Defendants affirmatively and
20 fraudulently concealed their unlawful conduct from Plaintiff Oakland.

21     204. Plaintiff did not discover, and could not discover through the exercise
22 of reasonable diligence, that the Defendants were engaging in the illegal and
23 unlawful conduct as alleged herein until shortly before this litigation was
24 commenced. Nor could Plaintiff have discovered the violations earlier than that
25 time because Defendants engaged in their wrongdoing in secret, concealing the
26 nature of their unlawful conduct and acts in furtherance thereof, and fraudulently
27 concealed their activities through various other means and methods designed to
28 avoid detection. The nature of the wrongful act itself was to withhold the

1   disclosure of material financial information about the insurer Defendants from the

2   Plaintiff and other California public entities.

3       205.   Plaintiff could not have discovered the unlawful conduct at an earlier

4   date through the exercise of reasonable diligence because of Defendants' active

5   and purposeful concealment of their unlawful activities.  Indeed, it was not until

6   late 2007 and the beginning of 2008 that the insurer Defendants were downgraded

7   and placed on negative credit watch.

8       206.   As a result of Defendants' fraudulent concealment of their wrongful

9   acts, Plaintiff asserts the tolling of any applicable statute of limitations affecting

10  the rights of action of Plaintiff.

11                          **XIII.**

12                   **CLAIMS FOR RELIEF**

13                   **FIRST CAUSE OF ACTION**

14                   **BREACH OF THE COVENANT**

15              **OF GOOD FAITH AND FAIR DEALING**

16      **(Against Defendants Ambac, MBIA, FGIC, XL Capital and CIFG)**

17      207.   Plaintiff repeats and realleges each of the foregoing paragraphs of this

18  complaint and incorporate them by reference as though set forth in full herein.

19      208.   The insurer Defendants entered into bond insurance contracts with the

20  Plaintiff and owed it a duty of good faith and fair dealing.  By insuring risky

21  subprime loans and investing heavily in the subprime markets, the insurer

22  Defendants violated that duty of good faith and fair dealing.  By failing to disclose

23  their weak financial condition and the extent of their exposure to the subprime

24  market, the insurer Defendants also violated that duty of good faith and fair

25  dealing.  The sole asset that the bond insurance companies sold to the Plaintiff was

26  their "AAA" rating which they improperly and unlawfully jeopardized by insuring

27  subprime loans and other subprime market instruments.  The insurer Defendants

28  compounded their wrongdoing by failing to disclose their true risk exposure to

1  Plaintiff Oakland.  If the insurer Defendants had disclosed the nature of their

2  wrongful conduct, Plaintiff Oakland would not have purchased bond insurance

3  from the insurer Defendants.

4        209.   The illegal and unlawful acts alleged herein have had the following

5  effects on Plaintiff: (1) requiring the expenditure of unnecessary taxpayer dollars

6  for the acquisition of municipal bond insurance; (2) being forced to pay

7  unreasonably high interest rates on the issuance of municipal bonds and (3) being

8  forced to incur additional refinancing costs as a result of the Insurer Defendants'

9  misconduct.

10       WHEREFORE, Plaintiff prays for judgment against Defendants, and each of

11  them, as set forth below.

## SECOND CAUSE OF ACTION

## FRAUD AND DECEIT

### (Against Defendants Ambac, MBIA, FGIC, XL Capital and CIFG)

15       210.   Plaintiff repeats and realleges each of the foregoing paragraphs of this

16  complaint and incorporate them by reference as though set forth in full herein.

17       211.   The insurer Defendants, and each of them, made material

18  representations and omissions to Plaintiff which were false and misleading,

19  including but not limited to those representations and omissions as to the financial

20  condition of the Defendants.  These material misrepresentations and omissions are

21  contained in and reflected in public statements, including financial statements, and

22  other disclosures made by the Defendants.

23       212.   The insurer Defendants had an obligation and duty to disclose to the

24  Plaintiff that they had exposed themselves to risky subprime loans and that their

25  triple-A credit rating was not deserved.  The Defendants, and each of them, made

26  the representations and failed to disclose and suppressed information they had a

27  duty to disclose, as set forth hereinbefore.  The Defendants did so with knowledge

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1  of the falsity of their statements and representations and knew that they were

2  failing to disclose material facts which they had a duty to disclose.

3      213.   At the time these misrepresentations were made and the material facts

4  not disclosed, the Plaintiff was ignorant of the true facts. If the Plaintiff had

5  known the true facts, they would not have purchased bond insurance from the

6  Defendants.

7      214.   Plaintiff reasonably relied on Defendants' representations in

8  purchasing municipal bond insurance from the insurer Defendants.

9      215.   As a direct and proximate result of the wrongful conduct of each of

10  the Defendants, Plaintiff purchased bond insurance from the Defendants and has

11  since suffered and will continue to suffer economic losses and other general and

12  specific damages, all in an amount to be determined according to proof.

13      WHEREFORE, Plaintiff prays for judgment against Defendants, and each of

14  them, as set forth below.

15                    **THIRD CAUSE OF ACTION**

16                    **BREACH OF CONTRACT**

17      **(Against Defendants Ambac, MBIA, FGIC, XL Capital and CIFG)**

18      216.   Plaintiff repeats and realleges each of the foregoing paragraphs of this

19  complaint and incorporate them by reference as though set forth in full herein.

20      217.   Plaintiff entered into bond insurance agreements with the Defendant

21  bond insurance companies. As part of those agreements, the Defendants had a

22  duty to act in good faith to maintain their triple-A rating. Indeed, the purpose of

23  the contract was to acquire insurance from a "triple-A" bond insurance company,

24  not a company that had billions of dollars of hidden exposures and liabilities. The

25  size and extent of those liabilities were massive enough to jeopardize the "triple

26  A" rating of the bond insurance companies, the very product the bond insurance

27  companies were selling to Plaintiff Oakland.

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1    218.  Oakland has performed each and every act required to be performed

2  by it pursuant to the bond insurance agreements.

3    219.  The insurer Defendants have breached the insurance agreements

4  through their reckless conduct in exposing themselves to the subprime markets for

5  billions of dollars.

6    220.  As a direct and legal result of this breach of contract, Plaintiff

7  Oakland has been damaged in an amount to be ascertained at the time of trial.

8    WHEREFORE, Plaintiff prays for judgment against Defendants, and each of

9  them, as set forth below.

## FOURTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

### (Against All Defendants)

13    221.  Plaintiff repeats and realleges paragraphs ¶¶ 1 - 206 of this complaint

14  and incorporate them by reference as though set forth in full herein.

15    222.  The insurer Defendants, and each of them, made material

16  representations and omissions to Plaintiff which were false and misleading,

17  including but not limited to those representations and omissions as to the financial

18  condition of the Defendants.  These material misrepresentations and omissions are

19  contained in and reflected in public statements, including financial statements, and

20  other disclosures made by the Defendants.

21    223.  The Defendants had an obligation and duty to disclose to the Plaintiff

22  that they had exposed themselves to risky subprime loans and that their triple-A

23  credit rating was not deserved.  In making the representations and omissions, and

24  in doing the above things alleged, Defendants, and each of them, acted without

25  any reasonable grounds for believing their representations were true, and intended

26  by said representations to induce the reliance of the Plaintiff to purchase bond

27  insurance.  Plaintiff relied upon these false representations, concealments, and

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                          54

1 | nondisclosures by Defendants, and because of this, purchased bond insurance
2 | from the Defendants.

3 | 224.  At the time these misrepresentations were made and the material facts
4 | not disclosed, the Plaintiff was ignorant of the true facts.  If the Plaintiff had
5 | known the true facts, they would not have purchased bond insurance from the
6 | Defendants.

7 | 225.  Plaintiff reasonably relied on Defendants' representations in
8 | purchasing municipal bond insurance from the insurer Defendants.

9 | 226.  As a direct and proximate result of the wrongful conduct of each of
10 | the Defendants, Plaintiff purchased bond insurance from the Defendants and has
11 | since suffered and will continue to suffer economic losses and other general and
12 | specific damages, all in an amount to be determined according to proof.

13 | WHEREFORE, Plaintiff prays for judgment against Defendants, and each of
14 | them, as set forth below.

## FIFTH CAUSE OF ACTION
## NEGLIGENCE

### (Against Defendants Ambac, MBIA, FGIC, XL Capital and CIFG)

18 | 227.  Plaintiff repeats and realleges paragraphs ¶¶ 1 - 206 of this complaint
19 | and incorporate them by reference as though set forth in full herein.

20 | 228.  Plaintiff is informed and believed, and thereupon allege that the acts
21 | of the Defendants in insuring sub-prime mortgage instruments and other financial
22 | instruments such as CDO's was done negligent and carelessly.  In addition, due to
23 | the flawed methodology of rating such securities employed by the Credit Rating
24 | Agencies, it was negligent for the Defendants to insure both these high risk
25 | instruments while simultaneously insuring safe municipal bonds that relied on that
26 | insurance to maintain high ratings on their own bond issuances.  Defendants owed
27 | a duty to Plaintiff Oakland not to act in a reckless and unreasonable manner.  The

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                55

1  Defendants breached that duty and, as a result, caused the economic harm, injury
2  and/or damage to Plaintiff that are hereinabove set forth.

3      229.  As a direct and legal cause of the Defendants' wrongful acts and/or
4  omissions, Plaintiff has suffered and will continue to suffer harm from the
5  payment of insurance premiums for bond insurance that possesses no value, for
6  higher interest rates caused by the credit downgrade of the Defendants and for any
7  other refinancing costs endured due to the Defendants' misconduct.

8      WHEREFORE, Plaintiff prays for judgment against Defendants, and each of
9  them, as set forth below.

10              ## SIXTH CAUSE OF ACTION

11      ## VIOLATIONS OF CALIFORNIA CARTWRIGHT ACT

12              **(Against All Defendants)**

13      230.  Plaintiff repeats and realleges paragraphs ¶¶ 1 - 206 of this complaint
14  and incorporate them by reference as though set forth in full herein.

15      231.  The Defendants violated California Business and Professions Code
16  section 16720, *et seq.* (the "Cartwright Act"), by forming one or more
17  combinations to accomplish purposes prohibited by and contrary to the Cartwright
18  Act.  They engaged in an agreement, contract, combination, trust and/or
19  conspiracy to create and maintain artificial conditions for the acquisition of
20  municipal bond insurance.

21      232.  The Defendants committed acts that constituted prohibited conduct
22  under the Cartwright Act, including but not limited to making illegal agreements
23  among themselves to reduce competition and to raise and establish the price and
24  cost of municipal bond insurance.  Defendants' conduct has unfairly and
25  unlawfully increased the price and cost for the acquisition of municipal bond
26  insurance in the State of California.

27

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                    56

233. The California Supreme Court has specifically stated that a cause of action under the California Cartwright Act can be brought against the insurance industry in *Manufacturers Life Ins. Co. v. Superior Court* (1995) 10 Cal.4th 257.

234. As a direct result of the unlawful and unfair actions of the Defendants, Plaintiff suffered injury to its business and property. It has had to pay substantially more for the acquisition of municipal bond insurance than they would have absent Defendants' illegal and anti-competitive conspiracy. Moreover, it has had to endure higher interest rates and borrowing costs as a result of the improper conduct, as well as pay unnecessary fees and costs to the Defendants. These injuries have caused and will continue to cause damages to Plaintiff.

235. As a direct result of the acts of the Defendants, Plaintiff was required to file this action, resulting in ongoing attorneys' fees, costs, and other expenses for which it seeks recovery according to proof.

236. Pursuant to the Cartwright Act, Plaintiff is authorized to recover three times the damages it sustained plus interest and reasonable attorneys' fees, costs and expenses.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that:

A.     The Court adjudge and decree that the acts of the Defendants are illegal and unlawful and in violation of California state common and statutory law;

B.     Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff for damages as allowed by law as determined to have been sustained by them;

C.     Each of the Defendants, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and

1    employees, and all other persons acting or claiming to act on behalf of Defendants

2    or in concert with them, be permanently enjoined and restrained from, in any

3    manner, directly or indirectly, continuing, maintaining or renewing the

4    combinations, conspiracy, agreement, understanding or concert of action as

5    alleged herein;

6      D.     The Court award Plaintiff's attorneys' fees and costs, and

7    pre-judgment and post-judgment interest as permitted by law; and

8      E.     Because the aforementioned acts of the insurer Defendants, and each

9    of them, were done maliciously, oppressively, and with intent to defraud, Plaintiff

10   is entitled to punitive and exemplary damages in an amount to be shown according

11   to proof at the time of trial.

12      F.     The Court award Plaintiff such other and further relief as may be

13   necessary and appropriate.

14

15   DATED: August _28_, 2008 .     **CITY OF OAKLAND**

16

17                         By: _____

18                            JOHN A. RUSSO

19   DATED: August _28_, 2008     **COTCHETT, PITRE & McCARTHY**

20

21

22                         By: _____

23                           JOSEPH W. COTCHETT

24

25

26

27

28

COMPLAINT                                                            58

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

DATED: August 28 , 2008

CITY OF OAKLAND

By: _____

JOHN A. RUSSO

DATED: August 18 , 2008

COTCHETT, PITRE & McCARTHY

By: _____

JOSEPH W. COTCHETT

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

COMPLAINT

59

# EXHIBIT B

1    PROSKAUER ROSE LLP
     SCOTT P. COOPER, SBN 96905
2    KEITH BUTLER, SBN 215670
     2049 Century Park East, 32nd Floor
3    Los Angeles, California 90067-3206
     Telephone:   (310) 557-2900
4    Facsimile:    (310) 557-2193

5    Attorneys for Defendant
     MBIA, INC.
6

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                 **FOR THE COUNTY OF SAN FRANCISCO**

10

| | |
|---|---|
| 11   CITY OF OAKLAND, | Case No. CGC-08-479241 |
| 12            Plaintiff, | [Assigned to the Honorable Arlene T. Borick – Dept. 212] |
| 13            v. | **NOTICE TO STATE COURT OF** |
| 14   AMBAC FINANCIAL GROUP INC.; MBIA, INC.; | **DEFENDANTS' FILING OF** |
|      XL CAPITAL ASSURANCE INC.; FINANCIAL | **NOTICE OF REMOVAL TO U.S.** |
| 15   GUARANTY INSURANCE COMPANY; CIFG | **DISTRICT COURT FOR THE** |
|      ASSURANCE NORTH AMERICA, INC.; JASON | **NORTHERN DISTRICT OF** |
| 16   KISSANE; NEIL PACK; and Does 1 – 50, | **CALIFORNIA** |
| 17            Defendants. | Action Filed: August 28, 2008 |

18

19

20

21

22

23

24

25

26

27

28

7583/53559-017
Current/11991632v

NOTICE TO STATE COURT OF REMOVAL TO U.S. DISTRICT COURT

1    TO THE HONORABLE ARLENE T. BORICK, JUDGE OF THE SUPERIOR COURT OF THE

2    STATE OF CALIFORNIA, FOR THE COUNTY OF SAN FRANCISCO:

3          PLEASE TAKE NOTICE that on September 22, 2008, a Notice of Removal of the above-

4    entitled action pursuant to 28 U.S.C. § 1441(b) was filed in the United States District Court for the

5    Northern District of California, bearing Case No. _____.  A true and correct copy

6    of the Notice of Removal filed with the United States District Court for the Northern District of

7    California is attached hereto as Exhibit A.  Pursuant to 28 U.S.C. ¶ 1446(d), this Court "shall

8    proceed no further unless and until the case is remanded."

9

10

11   DATED:  September 22, 2008              PROSKAUER ROSE LLP
                                            SCOTT P. COOPER
12                                          KEITH BUTLER

13
                                            By:  _____
14                                                    Scott P. Cooper
                                            Attorneys for Defendants
15                                          MBIA, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE TO STATE COURT OF REMOVAL TO U.S. DISTRICT COURT

7583/53559-017
Current/11991632v

# EXHIBIT C

1 | PROSKAUER ROSE LLP
SCOTT P. COOPER, SBN 96905
2 | KEITH BUTLER, SBN 215670
2049 Century Park East, 32nd Floor
3 | Los Angeles, California 90067-3206
Telephone:     (310) 557-2900
4 | Facsimile:      (310) 557-2193

5 | Attorneys for Defendant
MBIA, INC.
6

7

8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 | **FOR THE COUNTY OF SAN FRANCISCO**

10

11 | CITY OF OAKLAND,

12 |            Plaintiff,

13 |            v.

14 | AMBAC FINANCIAL GROUP INC.; MBIA, INC.;
XL CAPITAL ASSURANCE INC.; FINANCIAL
15 | GUARANTY INSURANCE COMPANY; CIFG
ASSURANCE NORTH AMERICA, INC.; JASON
16 | KISSANE; NEIL PACK; and Does 1 – 50,

17 |            Defendants.

18

19

20

21

22

23

24

25

26

27

28

Case No. CGC-08-479241

[Assigned to the Honorable Arlene T.
Borick – Dept. 212]

**NOTICE TO ADVERSE PARTY OF
DEFENDANTS' FILING OF
NOTICE OF REMOVAL TO U.S.
DISTRICT COURT FOR THE
NORTHERN DISTRICT OF
CALIFORNIA**

Action Filed: August 28, 2008

- 1 –

NOTICE TO ADVERSE PARTY OF REMOVAL TO U.S. DISTRICT COURT

1   TO PLAINTIFF CITY OF OAKLAND AND ITS ATTORNEYS OF RECORD:

2        PLEASE TAKE NOTICE that on September 22, 2008, a Notice of Removal of the above-

3   entitled action pursuant to 28 U.S.C. § § 1441(b) was filed in the United States District Court for

4   the Northern District of California, bearing Case No. _____.   A true and correct

5   copy of the Notice of Removal filed with the United States District Court for the Northern District

6   of California is attached hereto as Exhibit A.

7

8

9   DATED:  September 22, 2008         PROSKAUER ROSE LLP
                              SCOTT P. COOPER

10                                 KEITH BUTLER

11

12                                 By: _____

13                                       Scott P. Cooper
                              Attorneys for Defendants
                              MBIA, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7583/53559-017
Current/11991626v

NOTICE TO ADVERSE PARTY OF REMOVAL TO U.S. DISTRICT COURT

# EXHIBIT D

## CONSENT TO REMOVAL

Defendant Ambac Financial Group, Inc. ("Ambac") hereby consents to removal of this action, *City of Oakland v. Ambac Financial Group Inc. et al.*, Docket No. CGC 08-479241, to federal court. This consent is given without waiving, and with a full reservation of, any and all rights, claims, and defenses of any nature whatsoever that Ambac may have, including but not limited to defenses related to service of process, jurisdiction, and venue.

Dated:  New York, New York
        September 22, 2008

Respectfully submitted,

PATTERSON BELKNAP WEBB & TYLER LLP
Robert P. LoBue
*rplobue@pbwt.com*
1133 Avenue of the Americas
New York, NY 10036-6710
(212) 336-2596
Fax:  (212) 336-2395

-and-

MURPHY, PEARSON, BRADLEY & FEENEY

James A. Murphy
*jmurphy@mpbf.com*
88 Kearny Street, 10th Floor
San Francisco, Ca  94108
(415) 788-1900
Fax: (415) 393-8087

*Attorneys for Defendant Ambac Financial*
*Group, Inc.*

## CONSENT TO REMOVAL

Defendant XL Capital Assurance Inc. ("XLCA") hereby consents to removal of this action, *City of Oakland v. Ambac Financial Group Inc. et al.*, Docket No. CGC-08-479241, to federal court.  This consent is given without waiving, and with a full reservation of, any and all rights, claims, and defenses of any nature whatsoever that CIFG may have, including but not limited to defenses related to service of process, jurisdiction, and venue.

Dated:  Los Angeles, California
        September 22, 2008

                                    Respectfully submitted,
                                    LOEB & LOEB LLP


                                    Daniel G. Murphy (Bar No. 141006)
                                    *dmurphy@loeb.com*
                                    10100 Santa Monica Blvd.
                                    Suite 2200
                                    Los Angeles, California  90067
                                    (310) 282-2000
                                    Fax: (310) 282-2200


                                    DEBEVOISE & PLIMPTON LLP

                                    Mark P. Goodman
                                    *mpgoodman@debevoise.com*
                                    Elliot Greenfield
                                    *egreenfield@debevoise.com*
                                    919 Third Avenue
                                    New York, New York 10022
                                    (212) 909-6000
                                    Fax: (212) 909-6836

                                    Attorneys for Defendant XL Capital
                                    Assurance Inc.

## CONSENT TO REMOVAL

Defendant Financial Guaranty Insurance Company ("FGIC") hereby consents to removal of this action, *City of Oakland v. Ambac Financial Group Inc. et al.*, Case No. CGC 08-479241, to federal court.  This consent is given without waiving, and with a full reservation of, any and all rights, claims, and defenses of any nature whatsoever that FGIC may have, including but not limited to defenses related to service of process, jurisdiction, and venue.

Dated:  September 22, 2008

Respectfully submitted,
RICHARDS KIBBE & ORBE LLP

David W.T. Daniels
*ddaniels@rkollp.com*
Portrait Building
701 8th Street, N.W.
Washington, DC 20001-3727
(202) 261-2960
Fax:  (202) 261-2999

Brian S. Fraser
*bfraser@rkollp.com*
One World Financial Center
New York, New York 10281-1003
(212) 530-1800
Fax:  (212) 530-1801

Attorneys for Defendant Financial Guaranty
Insurance Company

## CONSENT TO REMOVAL

Defendants CIFG Assurance North America, Inc. ("CIFG") and Neil Pack ("Pack") hereby consent to removal of this action, *City of Oakland v. Ambac Financial Group Inc. et al.*, Case No. CGC 08-479241, to federal court. This consent is given without waiving, and with a full reservation of, any and all rights, claims, and defenses of any nature whatsoever that CIFG and Pack may have, including but not limited to defenses related to service of process, jurisdiction, and venue.

Dated: New York, New York
        September 22, 2008

                    Respectfully submitted,

                    CADWALADER, WICKERSHAM &
                    TAFT LLP

By: _____
    Name: Jonathan M. Hoff
    jonathan.hoff@cwt.com
    One World Financial Center
    New York, New York 10281
    Phone: (212) 504-6474
    Fax: (212) 504-6666

                    Attorneys for defendants CIFG Assurance
                    North America, Inc. and Neil Pack